IN RE EDEN F. ET AL.*
(SC 15965)†

Callahan, C. J., and Borden, Berdon, Palmer and McDonald, Js.**

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Reporter of Judicial Decisions

† Reargument denied. *In re Eden F.*, 250 Conn. 924–25, 741 A.2d 873 (1999).

** The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued March 19—officially released September 21, 1999

*Susan T. Pearlman*, assistant attorney general, with whom were *Benjamin Zivyon*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Eliot Prescott*, assistant attorney general, for the appellant (petitioner).

*Roger E. Bunker*, for the appellee (respondent mother).

*David T. Stone*, for the minor children.

*Linda Pearce Prestley*, child advocate, and *Barbara J. Claire*, associate child advocate, filed a brief for the office of the child advocate as amicus curiae.

*Opinion*

PALMER, J. In this certified appeal, we must decide whether the Appellate Court properly reversed the judgments of the trial court terminating the parental rights of the respondent mother, Ann F., with respect to her two daughters, Eden and Joann. Specifically, we must determine whether the Appellate Court properly concluded that, pursuant to General Statutes (Rev. to 1995) § 17a-112,[1] the petitioner, the commissioner of children

[1] General Statutes (Rev. to 1995) § 17a-112, which governed nonconsensual termination of parental rights at the time the termination petitions in this case were filed, provides in relevant part: "Termination of parental rights of child committed to commissioner. (a) In respect to any child committed to the commissioner of children and families in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in the prior commitment proceeding, or an attorney appointed by the superior court on its own motion, or an attorney retained by such child after attaining the age of fourteen may petition the court for the termination of parental rights with reference to such child . . . .

"(b) The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; or (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral

and families (commissioner), was required to establish by clear and convincing evidence that reasonable efforts were made to reunify Ann F. with Eden and Joann as a predicate to the termination of Ann F.'s parental rights with respect to her two children. We

and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. . . .

"(d) Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the department of children and families has made reasonable efforts to reunite the family pursuant to the federal [Adoption Assistance and] Child *Welfare Act of 1980, as amended; (3) the terms of any applicable court order* entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent. . . ."

General Statutes (Rev. to 1995) § 17a-112 (b), now codified at § 17a-112 (c), was amended by Public Acts 1995, No. 95-238, § 3. See footnote 17 of this opinion. That amendment provides that, with certain exceptions not applicable in this case, the trial court may grant a petition for the termination of parental rights only if it finds, by clear and convincing evidence, that the department of children and families has made reasonable efforts to reunify the child with the parent. Although further revisions since have been made to this statutory subsection, those revisions are not relevant to any of the issues presented by this case.

Unless otherwise provided, all references to § 17a-112 throughout this *opinion are to the 1995 revision.*

conclude that, contrary to the determination of the Appellate Court, the commissioner was not required to make such a showing under the applicable statutory provisions.[2] We also address two additional claims that Ann F. raised in the Appellate Court but that were not decided by that court,[3] namely, that the trial court improperly: (1) found that Ann F. had failed to rehabilitate herself; and (2) concluded that the termination of Ann F.'s parental rights was in Eden's best interest.[4] We reject these claims and reverse the judgment of the Appellate Court.

The opinion of the Appellate Court; *In re Eden F.*, 48 Conn. App. 290, 710 A.2d 771 (1998); sets forth the following relevant facts. "Ann F. was born in Hartford on February 27, 1959 . . . [and] spent the majority of her childhood in a foster home. In 1975, at the age of fifteen,[5] Ann F. was admitted for psychiatric care to Norwich State Hospital (Norwich). Thereafter, she was

[2] We granted certification on the following issue: "Did the Appellate Court properly conclude that: (1) the petitioner, the commissioner of children and families, was required to prove that she had made reasonable efforts to reunite both children with the respondent mother, and (2) the trial court's findings in this respect were clearly erroneous?" *In re Eden F.*, 245 Conn. 917, 717 A.2d 234 (1998). In view of our conclusion with respect to the first part of the certified issue, we do not reach the second part.

[3] The Appellate Court did not reach Ann F.'s two other claims in light of its conclusion that she was entitled to dismissal of the termination petitions on the ground that the evidence did not support the trial court's finding regarding reasonable reunification efforts.

[4] Although we normally would remand the case to the Appellate Court for determination of the two issues not certified by this court, we have decided to address those issues in the interest of expediting the resolution of this case. See *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 292, 455 A.2d 1313 (1983) ("[t]oo often the courts of this state are faced with a situation where . . . litigation has continued for years while the children, whose interests are supposed to be paramount, suffer in the insecurity of 'temporary' placements"). In light of our decision to consider those issues, we granted the parties and amicus curiae the opportunity to submit supplemental briefs to address those two issues.

[5] "Ann F. has a ninth grade education." *In re Eden F.*, supra, 48 Conn. App. 292 n.3.

admitted to Norwich on several more occasions with one stay lasting for more than one year.[6] At Norwich, she was diagnosed with chronic undifferentiated schizophrenia and other disorders over the years including bipolar disorder with psychotic features.

"While at Norwich, Ann F. met and married Thomas F.[7] in 1982 and her first child, Eden, was born on July 2, 1988. Eden is a child with special needs. [The department of children and youth services, now the department of children and families (department)][8] removed Eden from Ann F.'s care when Eden was only five days old, due to Ann F.'s psychiatric state. The court granted temporary custody of Eden to [the department] on July 15, 1988. On September 22, 1989, Eden was committed to the commissioner . . . as a neglected child because of the hospital admission of Ann F. On that date, Ann F. signed expectations[9] that were accepted by the court. Eden remained in foster care until she was nearly three years old.

"Although on January 31, 1991, the court granted [the department's] petition to extend Eden's commitment, Eden began living with [Ann F.] on February 1, 1991. While Eden lived with [Ann F., the department] worked with Ann F. and provided a number of services to her. On June 13, 1991, the [department] filed a petition to

---

[6] "Ann F. has also had admissions to Manhattan State Hospital and Bellevue Hospital in New York City, as well as several admissions to Cedarcrest Regional Hospital in Newington." *In re Eden F.*, supra, 48 Conn. App. 292 n.4.

[7] "Apparently little is known of Ann F.'s relationship with Thomas F. except that she considered him to be involved with cocaine and that he was extremely abusive to her." *In re Eden F.*, supra, 48 Conn. App. 293 n.5.

[8] Effective July 1, 1993, the department of children and youth services was succeeded by the department of children and families. See General Statutes (Rev. to 1995) § 17a-1 (c). For ease of reference, we refer to the agency as the department throughout this opinion.

[9] "The expectations were papers that described steps Ann F. needed to follow to facilitate the return of Eden to her care." *In re Eden F.*, supra, 48 Conn. App. 293 n.6.

revoke Eden's commitment. The court granted [the department's] motion to revoke commitment on August 7, 1991.

"In 1992, [the department] received four referrals concerning Ann F.'s conduct with Eden, including a report of Ann F.'s yelling, shaking and hitting Eden. Another referral, which was made just prior to the birth of Ann F.'s second child, Joann, on September 8, 1992, was from the Manchester police department on July 16, 1992, alleging that '. . . Ann F. . . . is a repeated complainant of sexual assault and strange goings on at the home. She claims that Randy M., the [alleged] father of . . . [Joann], sneaks in through the window at about 1:30 a.m. and sexually assaults [her].' That report also stated that she usually slept through it. It also indicated that '[t]he condition of the apartment is very slovenly with trash and clutter strewn about. The smoke detector was also deactivated due to the removal of the battery.' In a call to [the department], Ann F. reported that her boyfriend, Randy M., would break into her apartment with seven men who sexually harassed her and performed witchcraft techniques on her.

"In March, 1993, [the department] received a referral from the Manchester Memorial Hospital emergency room that Ann F. had walked out of the visitor's lounge leaving Eden, then age four, to care for Joann, then seven months old. At that time, Ann F. was admitted to [that] hospital on a physician's emergency certificate,[10] and [the department] invoked a ninety-six hour hold on both children, who have been cared for in the same foster home ever since. Ann F. was transferred from Manchester Memorial Hospital to Cedarcrest Regional Hospital (Cedarcrest), where she remained

---

[10] "On March 12, 1993, a social worker went to retrieve Ann F. from the hospital to transport her and the two children to a shelter when he learned that Ann F. had decompensated and would not be discharged." *In re Eden F.*, supra, 48 Conn. App. 294 n.7.

until August, 1993. Upon her discharge from Cedarcrest, she began receiving services from the Manchester Memorial Hospital Outpatient Mental Health Clinic [(clinic)] and the Horizons program [(Horizons)]. Horizons provides services to the psychologically impaired so they can live independently in the community. Her case manager, Candace Stone, worked with Ann F. up [until] the time of trial.

"On March 12, 1993, [the department] filed a petition seeking the commitment of Eden and Joann. On that date, the court granted an order of temporary custody of both children to [the department]. On October 21, 1993, the court adjudicated Eden and Joann neglected based on Ann F.'s plea of nolo contendere. The court committed the children to the department for the statutory period. Also on that date, Ann F. signed, and the court entered, a new set of expectations.

"Ann F. was hospitalized three times in 1993 for mental instability. Eden and Joann were taken for weekly visits with Ann F. while she was in Cedarcrest in 1993. Weekly visitation continued after she returned home. Ann F. continued outpatient treatment at [the clinic]. Throughout the remainder of 1993 and into the first six months of 1994, Ann F. stabilized within her limitations and participated in weekly supervised visits with her two children.

"On June 1, 1994, the department developed what it called 'an extensive plan . . . to determine what was in the best interest of [Ann F.'s] children.' This plan was to give [Ann F.] every opportunity to prove her parenting abilities and was to be executed through 'the Exchange Club,' which would supervise the children's visits with Ann F. The length of these visits would be increased from one hour to one and one-half hours for seven weeks. If these visits were successful, a series of unsupervised visits could be scheduled.

"At a department case status conference on July 26, 1994, the consensus opinion was that due to Eden's escalating behaviors she should be thoroughly evaluated by [the] Newington Children's Hospital PEDAL[11] medical program, which evaluation began at the end of August, 1994. On September 4, 1994, in accordance with the Exchange Club recommendation, four weeks of unsupervised visitation began but there was no mechanism to assess these visits since they were unsupervised. On October 8, 1994, four weeks of overnight visitation began, with an emergency telephone line available if Ann F. needed assistance or had an emergency. These visits again could not be assessed since they were unsupervised. In any event, the children did not show any evidence of physical abuse. In late October, 1994, a decision was made to return Eden to Ann F. on a trial basis for two months to make a final determination of Ann F.'s capabilities of caring for [Eden]. The department's position was: 'If this two month trial was successful then strong consideration would be given to returning the youngest child, Joann, home.' In November, 1994, it was decided to put on hold Eden's return home to Ann F. until Ann F. obtained her own apartment.

"Eden was returned to Ann F. on February 27, 1995. Difficulties with the reunification quickly appeared. At the time of Eden's return, PEDAL was in the midst of conducting a comprehensive evaluation of Eden as requested by the department. As part of this evaluation, Eden was seen for the following: pediatric neurology, psychiatry, ophthalmology, audiology, psychology, education and occupational therapy. The testing for this evaluation occurred from December, 1994, through April, 1995. The results of the PEDAL evaluation were not disclosed until after April 19, 1995. The evaluation

---

[11] "PEDAL is an acronym for program for evaluation of development and learning." *In re Eden F.*, supra, 48 Conn. App. 295 n.8.

indicated that Eden 'is diagnosed with Reaction Attachment Disorder compounded by symptoms of depression, behavioral disturbance, including oppositionality and defiance.' The evaluation made a number of suggestions on how to address Eden's needs given her substantial behavioral and emotional issues.

"Upon Eden's return to [Ann F.], Eden did not attend school for almost three weeks. The department was aware, *before* Eden was returned to [Ann F.], that there was a problem with the Manchester board of education in gaining her admission. Nevertheless, the department returned her.

"Additionally, Eden's parent-child therapy with Thomas Spudic, a psychologist who worked with Ann F. and the children, ceased in December, 1994, when he left Connecticut. Therapy was not resumed until sometime in March, 1995, after Eden was returned to Ann F. Moreover, even though the department made arrangements for a parent aide,[12] who came once within the first week or so of Eden's return, neither the new therapist nor the parent aide was in place when Eden was returned.[13]

"A crisis telephone line was put in place when Eden was returned to Ann F. The crisis line, aptly named, had as its apparent purpose to enable rapid communication by Ann F. with department staff. On Sunday, March 12, 1995, Ann F. called the crisis line and stated that she 'needed someone to talk to and Eden had been a little out of control.'[14] Apparently, Ann F. was required

---

[12] "The parent aide visited Ann F.'s home twice during the three weeks Eden was there in February and March, 1995." *In re Eden F.,* supra, 48 Conn. App. 297 n.9.

[13] "Although no dates were given, the referral for the parent aide and some pastoral care were made before Eden's return." *In re Eden F.,* supra, 48 Conn. App. 297 n.10.

[14] "The department 'Social Study for Termination of Parental Rights,' written by Kenneth Crosby, a department social worker, stated the following: '[March 17, 1995] this worker called [Ann F.] about her having called the crisis line at 12 a.m. at night the previous Sunday. [Ann F.] stated she had

to leave this information in a message. Kenneth Crosby, a department social worker, returned Ann F.'s call to the crisis line the following Friday, March 17, 1995, five days later.

"On Tuesday, March 21, 1995, the department removed Eden from [Ann F.'s] home and returned her to foster care. This removal followed an incident that occurred the prior weekend and also was reported to the department. Ann F., who had been caring for Eden without respite for twenty-four hours a day for about three weeks, went to a bingo game in the neighborhood with a female friend. Ann F. left Eden in the care of two men, one of whom Ann F. hardly knew, but who was acquainted with Ann F.'s female friend. The child of Ann F.'s female friend was also there. When Ann F. returned later that evening, there were beer cans strewn about her apartment, the sink was full of dishes, and Eden's bedroom was 'trashed.' There was no indication, however, that Eden had been harmed in any way.

"The day after the department removed Eden, it received a report of Eden scratching [Ann F.] as well as an anonymous caller who reported hearing Eden cry, '[m]ommy, don't hit me.'[15] The department replaced Eden in her former foster home. Joann was not returned to Ann F. at all in 1995.

"On April 6, 1995, the parties agreed to, and the court granted, an extension of the [the children's] commitment to the department for the statutory period beginning April 21, 1995. On June 26, 1995, the department filed petitions in the Superior Court, Juvenile Matters, seeking to terminate the parental rights of Ann F., Randy M., the alleged father of Joann, and Thomas F., the

---

needed someone to talk to and Eden had been a little out of control.' " *In re Eden F.*, supra, 48 Conn. App. 297 n.11.

[15] "The trial court found that such a report had been made, but not that any hitting had in fact occurred." *In re Eden F.*, supra, 48 Conn. App. 298 n.12.

father of Eden. Each petition alleged that '[t]he child has been found in a prior proceeding to have been neglected or uncared for. . . . [Ann F.] has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child . . . she . . . could assume a responsible position in the life of the child.' This ground is alleged to have existed for more than one year. On July 20, 1995, the court accepted Thomas F.'s affidavit of consent to his termination of parental rights as to Eden. The petition concerning Joann was thereafter amended to allege that Randy M. had abandoned Joann, that he failed to rehabilitate and that there was no ongoing parent-child relationship as provided in § 17a-112 (b). On July 24, 25, 26, 29 and 30, 1996, a trial was held on both petitions." (Emphasis in original; internal quotation marks omitted.) Id., 291–99.

Following the trial, the court, citing § 17a-112 (b) (2), "found by clear and convincing evidence that the parents have not achieved a useful and constructive role as parents; nor, given the needs of the children, especially Eden, [was] such rehabilitation foreseeable within a reasonable time. . . . [Upon consideration of each of the seven factors enumerated under § 17a-112 (d), the trial court] then proceeded in the dispositional phase to find [by clear and convincing evidence] that the termination of parental rights was in the best interests of the children.

"By motion dated August 23, 1996, Ann F. requested reargument. That motion alleged, inter alia, that the [commissioner] . . . failed to prove by clear and convincing evidence that [the department had] made reasonable efforts to reunify either child with [Ann F.].

"The trial court denied the motion in a written memorandum, pointing out that a review of the file reflects that reasonable efforts at reunification were made on

two occasions in 1993 and once again while the case was pending on April 6, 1995. The court stated that 'the department . . . has made reasonable efforts given the situation and circumstances to provide counseling for Ann [F.], which she has continuously utilized. Efforts to reunite the child, Eden, with Ann [F.], were made in February, 1995. [Eden] was subsequently removed in March, 1995. Even [Ann F.] agreed that Eden was too difficult for her to control. . . . [Ann F.] simply does not have the intellectual or emotional wherewithal to raise these two children.' Moreover, the trial court noted that its written decision specifically addressed this matter.

"In addition, Ann F. also filed a 'Motion for Articulation of Decision Terminating Parental Rights of Mother.' The trial court, in articulating its decision, stated, inter alia, that it responded to each of the five specific questions raised [in Ann F.'s motion] including the finding that the department had made reasonable efforts to reunify both Eden and Joann with [Ann F.]. The court concluded that those findings were supported by clear and convincing evidence." (Citation omitted; internal quotation marks omitted.) Id., 303–305.

On appeal, the Appellate Court concluded that, pursuant to § 17a-112, the trial court was required to find, by clear and convincing evidence, that the department had made reasonable efforts to reunite Eden and Joann with Ann F. See id., 310–11. The Appellate Court further concluded that the facts did not support such a finding with respect to either child. Id., 317. Consequently, the Appellate Court reversed the trial court's judgment terminating Ann F.'s parental rights with respect to Eden and Joann and remanded the case to the trial court for dismissal of both petitions. Id., 323. On the commissioner's appeal to this court, we reverse the judgment of the Appellate Court.

I

We first must decide whether the Appellate Court properly determined that the commissioner was required to prove, by clear and convincing evidence, that reasonable efforts were made to reunify Ann F. with her children. The commissioner claims that she was not required to establish that the department had made reasonable reunification efforts because, contrary to the conclusion of the Appellate Court, § 17a-112 contained no such mandate at the time the petitions were filed in this case.[16] Ann F. claims that the Appellate Court properly determined that the commissioner was required to prove reasonable reunification efforts by clear and convincing evidence. Alternatively, Ann F. contends that, even if the commissioner was not required to show that reasonable efforts were made to reunite her with Eden and Joann, the 1995 amendment to § 17a-112; Public Acts 1995, No. 95-238, § 3 (P.A. 95-238);[17] which expressly requires a court to find that

[16] The petitions in this case were filed prior to the effective date of the 1995 and 1996 amendments to § 17a-112. See Public Acts 1996, No. 96-246, § 18; Public Acts 1996, No. 96-130, § 39; Public Acts 95-238, § 3. Although the trial in this case was conducted after the effective date of those amendments, it is undisputed that the date the petitions were filed—June of 1995—is the operative date for determining which statutory revision governs this case.

[17] Public Act 95-238, § 3, provides in relevant part: "Section 17a-112 of the general statutes is repealed and the following is substituted in lieu thereof . . .

"(b) The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds THAT THE DEPARTMENT OF CHILDREN AND FAMILIES HAS MADE REASONABLE EFFORTS TO REUNIFY THE CHILD WITH THE PARENT AND, upon clear and convincing evidence, that the termination is in the best interest of the child, and that . . . with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year. (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief

the department has made reasonable efforts to reunify parent and child, is retroactive and, therefore, applicable to the termination petitions filed in this case.[18] We reject both of Ann F.'s claims and conclude that the commissioner was not required to prove that reasonable efforts were made to reunify Ann F. with her children.

### A

Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the four grounds for termination of parental rights set forth in § 17a-112 (b) exists by clear and convincing evidence.[19] "The commissioner . . . in petitioning to terminate those rights, must allege and prove

that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; or (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. THE REQUIREMENT THAT THE DEPARTMENT OF CHILDREN AND FAMILIES HAS MADE REASONABLE EFFORTS TO REUNIFY THE CHILD WITH THE PARENT SHALL NOT APPLY TO TERMINATIONS OF PARENTAL RIGHTS BASED ON CONSENT OR TERMINATIONS OF PARENTAL RIGHTS WHERE SUCH REASONABLE EFFORTS AT REUNIFICATION WERE NOT POSSIBLE. . . ."

[18] The Appellate Court did not consider this issue.

[19] "Our statutes define the termination of parental rights as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . . It is a most serious and sensitive realm of judicial action." (Citation omitted; internal quotation marks omitted.) *In re Michael M.*, 29 Conn. App. 112, 117, 614 A.2d 832 (1992). Thus, "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State

one or more of the statutory grounds. In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Luis C.*, 210 Conn. 157, 165, 554 A.2d 722 (1989). "Section [17a-112 (b)] carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent." (Internal quotation marks omitted.) *In re Anna B.*, 50 Conn. App. 298, 303–304, 717 A.2d 289 (1998). One of the four predicates for the termination of parental rights under § 17a-112 (b) covers the situation in which, over an extended period of time, "the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (b) (2).

If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. When the petitions in this case were filed, § 17a-112 (d) required that the trial court, in determining whether to terminate parental rights, "consider and . . . make written findings regarding" seven separate factors, including: "(1) [t]he timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the

support its allegations by at least clear and convincing evidence." *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

reunion of the child with the parent; [and] (2) whether the department . . . has made reasonable efforts to reunite the family pursuant to the federal [Adoption Assistance and] Child Welfare Act of 1980, as amended . . . ." General Statutes § 17a-112 (d).

The question of whether the commissioner was required to prove that the department had made reasonable efforts to reunify Ann F. with Eden and Joann under the applicable statutory scheme "is a matter of statutory interpretation, which is a matter of law, requiring plenary review. . . . In interpreting statutes, our analysis is guided by well established principles of statutory construction. [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *Lopiano* v. *Lopiano*, 247 Conn. 356, 363, 752 A.2d 1000 (1998).

At the time that the petitions were filed in this case, § 17a-112 did not contain any language to suggest that the court could terminate parental rights only upon a finding, by a standard of clear and convincing evidence or otherwise, that the department had made reasonable efforts to reunify parent and child. Rather, pursuant to § 17a-112 (b), the trial court was authorized to terminate parental rights upon a showing, by clear and convincing evidence, first, that one or more of the four scenarios set forth in § 17a-112 (b) had been proven, and second, that the termination of parental rights was in the best interest of the child. Although § 17a-112 (d) (1) and (2) mandated that the trial court make written findings

regarding the timeliness, nature, extent and reasonableness of the efforts made to reunify parent and child, § 17a-112 contained nothing to indicate that any such finding was a prerequisite to the termination of parental rights. Thus, when the petitions in this case were filed, the factors to be considered under § 17a-112 (d) served only to guide the trial court in making its ultimate decision whether to grant the termination petition. See, e.g., *In re Christine F.*, 6 Conn. App. 360, 369, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986) (termination in best interest of child despite trial court's conclusion that strong emotional ties existed between mother and child). Thus, "the fact that the legislature [had interpolated] objective guidelines into the open-ended fact-oriented statutes which govern [parental termination] disputes; *Seymour* v. *Seymour*, 180 Conn. 705, 710, 433 A.2d 1005 (1980); should not be construed as a predetermined weighing of evidence; *Yontef* v. *Yontef*, 185 Conn. 275, 282, 440 A.2d 899 (1981); by the legislature. Where . . . the record reveals that the trial court's ultimate conclusions [regarding termination of parental rights] are supported by clear and convincing evidence, we will not reach an opposite conclusion on the basis of any one segment of the many factors considered in a termination proceeding . . . . *In re Theresa S.*, [196 Conn. 18, 25, 491 A.2d 355 (1985)]." (Internal quotation marks omitted.) *In re Christine F.*, supra, 369–70.

The Appellate Court did not expressly articulate its rationale for concluding that the trial court was required to find, as a predicate to the termination of Ann F.'s parental rights, that the commissioner established, clearly and convincingly, that reasonable efforts were made to reunify Ann F. with Eden and Joann. Ann F. claims, however, that the Appellate Court's construction of § 17a-112 is supported by our state's public policy, as expressed by the legislature, "to strengthen the

family and to make the home safe for children by enhancing the parental capacity for good child care . . . ." General Statutes § 17a-101 (a).[20] A general statement of public policy underscoring the desirability of maintaining the integrity of the family unit, however, cannot trump the plain and unambiguous language of the statutory provision detailing with specificity the substantive rights of the parties to a termination proceeding. Under § 17a-112 (b), the court is authorized to terminate parental rights only in four limited circumstances and, moreover, the court is required to make written findings regarding the seven separate factors set forth in § 17a-112 (d), including "[t]he timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent"; General Statutes § 17a-112 (d) (1); and "whether the department . . . has made reasonable efforts to reunite the family pursuant to the federal [Adoption Assistance and] Child Welfare Act of 1980, as amended . . . ." General Statutes § 17a-112 (d) (2). Thus, our interpretation of § 17a-112 as not requiring the commissioner to prove reasonable efforts at reunification does not contravene the public policy declared by the legislature in § 17a-101.

Ann F. also contends that the federal Adoption Assistance and Child Welfare Act of 1980 (act); 42 U.S.C. § 670 et seq.;[21] provides support for her contention that,

---

[20] General Statutes § 17a-101 (a) provides: "The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family."

[21] Title 42 of the United States Code, § 672 (a), provides in relevant part: "Each State with a plan approved under this part shall make foster care maintenance payments . . . with respect to a child who would meet the requirements of section 606(a) of this title or of section 607 of this title . . . if—

under § 17a-112, her parental rights could not be terminated absent a showing, by clear and convincing evidence, that the department had made reasonable efforts at reunification. As the Appellate Court has stated, however, "[t]he act . . . is an appropriations act and does not apply to individual actions or judicial findings . . . but merely sets forth general guidelines for a state's continued eligibility to receive funds for foster care maintenance." *In re Cynthia A.*, 8 Conn. App. 656, 664, 514 A.2d 360 (1986). The act, therefore, has no bearing on the question of whether, under § 17a-112, the commissioner was required to establish, as a predicate to the termination of Ann F.'s parental rights, that the department had made reasonable efforts to reunite Ann F. with Eden and Joann.

Finally, Ann F. asserts that because principles of due process require proof of the facts that warrant a termination of parental rights by clear and convincing evidence; see footnote 19 of this opinion; we must construe § 17a-112 (b) as embodying the requirement that the commissioner establish, by clear and convincing evidence, that the department had made reasonable efforts to reunite Ann F. with her two children. We disagree. Proof of reasonable reunification efforts is not a constitutionally mandated prerequisite to granting a petition

"(1) the removal from the home occurred pursuant to a voluntary placement agreement entered into by the child's parent or legal guardian, or was the result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child and . . . that reasonable efforts of the type described in section 671(a)(15) of this title have been made . . . ." 42 U.S.C. § 672 (a) (1994).

Title 42 of the United States Code, § 671 (a), provides in relevant part: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the [s]ecretary [of health and human services] which—
* * *
"(15) . . . provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home . . . ." 42 U.S.C. § 671 (a) (1994).

for the termination of parental rights. The constitutional requirement of proof by clear and convincing evidence applies only to those findings upon which the ultimate decision to terminate parental rights is predicated.[22] Prior to the 1995 amendment of § 17a-112, the reasonableness of the department's efforts at reunification was not one of the factors that the legislature had incorporated in § 17a-112 (b) as a prerequisite to termination.

If, prior to 1995, the legislature had intended to condition the termination of parental rights on a finding that reasonable efforts were made to reunify parent with child, it easily could have expressed this intent. See *State* v. *Desimone*, 241 Conn. 439, 455, 696 A.2d 1235 (1997). Indeed, the legislature manifested just such an intent when, in 1995, it amended § 17a-112 to add the requirement that Ann F. would have us read into the pre-1995 amendment version of the statute. No such legislative directive can be found in the language or history of § 17a-112 as it existed prior to its 1995 amendment. See id. ("[a]bsent compelling countervailing reasons, we will not impute to the legislature an intent that is not apparent from the plain statutory language"). Under that statutory provision, the trial court was

_____

[22] *Santosky* v. *Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982), upon which Ann F. relies, does not dictate a contrary result. Under the New York statute at issue in *Santosky*, the trial court was required to find, as a precondition to granting a termination petition, that the state had "made diligent efforts to encourage and strengthen the parental relationship." (Internal quotation marks omitted.) Id., 748. The United States Supreme Court concluded that, in light of a parent's compelling interest in maintaining his or her parental status, the state was required, under the due process clause of the fourteenth amendment, to establish, by *clear and convincing evidence*, that it had satisfied the statutory conditions for the termination of parental rights, including the "diligent efforts" requirement. Id., 768–69. At no time did the court suggest that a showing of reasonable or diligent efforts at reunification was itself constitutionally mandated. *Santosky* holds, rather, that the statutory prerequisites to the termination of parental rights must be established, at a minimum, by clear and convincing evidence. Id., 769.

required to *consider* the efforts the department made to reunify Ann F. with Eden and Joann, and to *make written findings* regarding those efforts, and the trial court did so. For petitions filed before the effective date of the 1995 amendment, however, the commissioner was not required to establish the *reasonableness* of those efforts.

### B

Alternatively, Ann F. claims that P.A. 95-238, which amended § 17a-112 (b) by adding the requirement that the department make reasonable efforts to reunify parent and child, applies retroactively.[23] We reject this claim.

"Whether to apply a statute retroactively or prospectively depends upon the intent of the legislature in enacting the statute. . . . In order to determine the legislative intent, we utilize well established rules of statutory construction. Our point of departure is General Statutes § 55-3, which states: No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have retrospective effect. The obligations referred to in the statute are those of substantive law. . . . Thus, we have uniformly interpreted § 55-3 as a rule of *presumed* legislative intent that statutes affecting *substantive* rights shall apply prospectively only. . . . This presumption in favor of prospective applicability, however,

---

[23] Public Act 95-238 contains no express requirement that reasonable efforts at reunification shall be proven by clear and convincing evidence. The clear and convincing standard, however, is constitutionally mandated. See *Santosky* v. *Kramer*, 455 U.S. 745, 768–69, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); footnote 22 of this opinion. One of the 1996 amendments to § 17a-112; Public Acts 1996, No. 96-246, § 18; expressly provides that the court may grant a termination petition only upon a showing, by clear and convincing evidence, that the department has made reasonable reunification efforts.

may be rebutted when the legislature clearly and unequivocally expresses its intent that the legislation shall apply retrospectively. . . . Where an amendment is intended to clarify the original intent of an earlier statute, it necessarily has retroactive effect. . . . We generally look to the statutory language and the pertinent legislative history to ascertain whether the legislature intended that the amendment be given retrospective effect." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Colonial Penn Ins. Co.* v. *Bryant,* 245 Conn. 710, 718–19, 714 A.2d 1209 (1998).

Neither the language nor the history of P.A. 95-238 contains any indication that the legislature intended that it be applied retroactively. Ann F. contends, however, that the amendment is procedural, rather than substantive and, consequently, we must presume that the legislature intended its retroactive application. Ann F. also claims that the legislative debate on the 1995 amendment indicates that it was intended to clarify the original intent of the earlier statute and, therefore, should be applied retroactively for that reason. In support of her claims, Ann F. relies on several comments made by legislators during the debate on the bill in the House of Representatives.

We disagree with Ann F.'s claims. First, the requirement that the department make reasonable efforts to reunite parent and child affects the substantive rights of the parties to a termination proceeding. The requirement of reunification efforts provides additional substantive protection for any parent who contests a termination action, and places a concomitant burden on the state to take appropriate measures designed to secure reunification of parent and child. Moreover, to the extent that the requirement reflects an important state policy favoring the reunification of parent and

child, as Ann F. herself has asserted, the express recognition of that policy in P.A. 95-238 cannot be considered procedural rather than substantive.

Furthermore, P.A. 95-238, which contains five separate sections, also made other substantive changes in the law.[24] For example, §§ 3 and 5 of P.A. 95-238 reduced the time period within which the parental rights with respect to certain children under the age of seven may be terminated. See, e.g., 38 S. Proc., Pt. 12, 1995 Sess., p. 4439, remarks of Senator Mark Nielsen ("[t]he bill allows the court to terminate parental rights sooner than it would otherwise have the ability to do in certain cases involving children under the age of seven"). We are especially reluctant to presume that the legislature intended the retroactive application of such provisions, for, as our Appellate Court has stated: "Although the issue of whether parental rights should have been terminated is to be decided by a trial court on the basis of conditions existing at the time of trial . . . there is no legislative or decisional mandate allowing a trial court to decide that issue on the basis of statutes existing at the time of trial, but not in effect when the termination petition was filed. . . . *Parents have a constitutionally protected right to raise and care for their children and that protection cannot be diluted by the use of statutory standards enacted subsequent to a petition to terminate that right, absent a counter legislative directive.*" (Citation omitted; emphasis added.) *In re Migdalia M.*, 6 Conn. App. 194, 200, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). Ann F. has provided no evidence, in the legislative history or elsewhere, to suggest that the legislature intended to dilute retroactively a parent's rights under §§ 3 and 5 of P.A. 95-238.

---

[24] We note that Ann F. does not appear to limit her claim regarding the retroactivity of P.A. 95-238 to only certain sections or provisions of that act.

Ann F.'s reliance on certain comments by several legislators during the house debate on P.A. 95-238 also is misplaced. First, Ann F. notes Representative Richard D. Tulisano's statement that the bill "changes procedures." 38 H.R. Proc., Pt. 10, 1995 Sess., p. 3736. Representative Tulisano, however, was not referring to the bill as a whole, but, rather, to a section, which was later withdrawn, regarding the creation of a child fatality review board. Ann F. also refers to a statement by Representative Scott Santa Maria, who indicated that the legislation "will make the legal process easier and easier for the [department] to act." Id., p. 3749. We discern nothing in Representative Santa Maria's comment to reflect the view that the amendment was intended to be retroactive. Finally, Ann F. points to a statement by Representative John W. Thompson describing a Senate amendment to the bill as "clarify [-ing] [our] statutes concerning reunification efforts." 38 H.R. Proc., Pt. 17, 1995 Sess., p. 6126. Immediately thereafter, however, Representative Thompson yielded to Representative Tulisano "for a brief further explanation of the [Senate] Amendment"; id.; at which point Representative Tulisano explained that the bill "clarifies and makes . . . clear that the obligation of a court to find that [the department] has done all it can to reunify the family does not exist when there's a *consent* [to termination] involved." (Emphasis added.) Id., pp. 6126–27. Taken in context, neither this comment, nor any other comment made during the pertinent legislative debate, evinces an intent by the legislature that § 3 of P.A. 95-238 was intended to clarify, rather than to change, the then existing law on reunification of parent and child. In the absence of clear and unequivocal evidence of such intent, we conclude that, because P.A. 95-238 effected substantive changes in the law regarding

the termination of parental rights, Ann F.'s retroactivity claim must fail.[25]

## II

We turn now to Ann F.'s remaining two claims, namely, that the trial court improperly found that: (1) she had failed to rehabilitate herself in satisfaction of the requirements of § 17a-112 (b) (2); and (2) the termination of her parental rights with respect to Eden was in Eden's best interest.[26] We reject both of these claims.

The opinion of the Appellate Court sets forth the following additional facts that are relevant to our resolution of these two claims. "At the trial, the department produced testimony [in its case-in-chief] from the following: psychiatrist Richard Sadler; psychologist David Mantell; [Crosby]; Janet Romayko, Eden's therapist in the community; Andrea Moran, one of Eden's therapists at Natchaug Hospital; Pavinee Saguansatsya, another of Eden's therapists at Natchaug Hospital; and the foster mother of the children. . . . Ann F. produced testimony from herself; Ilda DePina, a department social service assistant; Candace Stone, Ann F.'s mental health care manager; Steven Alloy, Ann F.'s psychiatrist; Benita Montalvo; Tina DeCosta; and Carol Anne Preste.[27] There was no rebuttal.

"Mantell, a clinical psychologist, prepared court-ordered psychological evaluations in 1993 and 1995.[28]

[25] In light of our conclusion that the commissioner was not required to prove that reasonable efforts had been made to reunify Ann F. with Eden and Joann, we need not consider the question of whether the evidence supported the trial court's finding that such efforts had been proven by clear and convincing evidence. See footnote 2 of this opinion.

[26] The record reflects that Ann F. challenges the trial court's "best interest of the child" determination with respect to Eden only.

[27] "Montalvo and DeCosta are referred to as 'friends and neighbors' of Ann F., while Preste is referred to as 'another friend' of Ann F." *In re Eden F.*, supra, 48 Conn. App. 299 n.14.

[28] "Prior to any adjudication of the petitions, Mantell and Sadler . . . conducted court-ordered evaluations. Both Mantell and Sadler testified at the trial." *In re Eden F.*, supra, 48 Conn. App. 299 n.15.

On October 4, 1993, a time when both children had visitation with Ann F. once a week, Mantell, by court referral, undertook individual psychological and relationship evaluations of both [Ann F.] and the children. He reported that Eden 'exhibited poor work product, short attention span, avoidance, resistance, inappropriate affect, oppositionality, pleasure from causing interpersonal distress and a broad range of socially and emotionally inappropriate behavior.' He opined that she adduced 'the profile of a significantly troubled child and that she appears to have substantial developmental delay.' As to Joann, who was only one year old at that time, he noted that 'her development seems to be broadly within average limits. She was a pleasant child who posed no difficulties on the evaluation day.' With reference to Ann F., about whom he had been given a good deal of historical information, [Mantell] said: 'It is evident that [Ann F.] had a significant history of mental disorder that has impaired her ability to function as an adult and also as a parent.' Aware of her bipolar status and her medication regimen, he said that '[h]er general manner of presentation is that of a psychologically simple, anxious, naive and child-like person with low stress tolerance who is being maintained by medication and substantial support service.' [Mantell's] report recommended 'that the children not live with [Ann F.] at this time.'

"Sadler . . . performed an evaluation of Ann F. in September, 1993. At that time, he was unable to assess who was the psychological parent of the children as he did not interview either child, nor did he see them interact with the major parenting figures in their lives. The trial court, in reviewing this report, noted Sadler's opinion that Ann F. had a stable and chronic psychiatric condition that had seriously impaired her functional abilities over many years, as well as her requirement of repeated hospitalizations and supportive outpatient

treatment efforts. Sadler opined in his report that '[Ann F.'s] history strongly suggests that [she] is unlikely to be able to develop parenting skills which have not been demonstrated in the past [and that] no discussion by [her] indicates an adequate appreciation of the deficits which would need to be corrected for her to maintain a stable environment for her children.'

"On October 4, 1995, Ann F. indicated to Sadler that the department was 'going for a Termination of Parental Rights . . . . I asked to have [Joann] as she's easier to handle . . . . Eden came back to me totally depressed. I could handle it.' He also said that 'much better than ordinary parenting will be needed [for] Eden in order to deal successfully with her handicaps and to capitalize upon her personality, intellectual and physical strengths.'

"On May 26, 1994, [Thomas] Spudic[29] [a psychologist] wrote of Ann F.'s 'considerable progress in her ability to stay focused, to speak coherently about her problems and in her ability to relate to Eden [as well as his being] very impressed with her genuine love for these children and her desire to be with them.' He nevertheless believed that her problems in dealing with the children 'seem to be exclusively a product of her emotional state/bipolar disorder . . . and [that] it is clear that she continues to have significant emotional problems.' He concludes that 'although [Ann F.] has made significant strides in caring for herself, I question her ability *at this time* to care for her children on a full-time basis. . . . [I]t is far from certain whether she could care for herself and both children . . . even with considerable support.' . . . Some six months later, on December 5, 1994, Spudic again reported his pessimism 'about Eden

---

[29] Spudic, a psychologist who worked with Ann F. and the children, did not testify at trial. The trial court did, however, rely on two of Spudic's letters in rendering its decision. *In re Eden F.*, supra, 48 Conn. App. 301 n.17.

making it permanently back with [Ann F.],' commenting that 'Eden is extremely challenging from a behavioral point of view.' Iterating Ann F.'s 'heart of gold,' Spudic candidly indicated that he hoped that he 'might be proved wrong in [his] prediction about the outcome of reunification.'

"Crosby[30] testified that the department actually had no intention of reunifying Joann with [Ann F.] unless the reunification of Ann F. with Eden was successful. No comment was made that the department, in deciding to return Eden first, discussed that issue with Mantell or any other therapist. The department admitted that when Eden was returned to [Ann F.] in February, 1995, Eden was being evaluated at Newington Children's Hospital and that that evaluation had been ongoing for a period of time. The department, however, did not await the outcome of that evaluation before returning Eden to Ann F. in February, 1995, because to do so would have added months more before the reunification could have occurred.

"At trial, Sadler stated that the department did not consult with him about the reunification before returning Eden to Ann F. . . . Alloy . . . testified that the reunification would have had 'a greater chance of success to start working [if Ann F. were reunified] with the more normal child, the younger daughter [Joann].'

"In its . . . memorandum of decision, the trial court found in the adjudicatory phase that, in late 1994 and early 1995, [the department] worked with other service

---

[30] "Crosby, who testified at length during the trial, was a department treatment worker who was responsible for keeping case records involved in these cases. Such a worker basically manages cases, assesses needs, provides services for the rehabilitation of families, provides reports concerning them and the like. He prepared the department's 'Social Study for the Termination of Parental Rights' in the two petitions in this case that came into evidence and the social study was referred to on a number of occasions during the trial." *In re Eden F.*, supra, 48 Conn. App. 302 n.18.

providers to reunify Eden with [Ann F.]. The trial court referred to the belief of Crosby, the department caseworker, that Ann F. had spent more time with Eden (two years) than with Joann and that if there were any bonding between [Ann F.] and the children, it was more likely to be with Eden. The trial court also relied on Mantell's view that while there was no evidence of an ongoing relationship between Ann F. and Joann, there [was] some evidence of a more distant bonding between [Ann F.] and Eden with great conflict and dissatisfaction in the relationship, particularly on Eden's side. In addition, the trial court observed in its memorandum of decision that the social study prepared by the department and the reports of Sadler and Mantell all recommend the termination of parental rights." (Emphasis in original; internal quotation marks omitted.) *In re Eden F.*, supra, 48 Conn. App. 299–303.

The trial court noted that, by all accounts, Ann F. loves her children and is highly motivated to be reunited with them. Nevertheless, the court found, by clear and convincing evidence, that, largely due to Ann F.'s longstanding and "serious personality disorder that [adversely] affects her ability to interrelate with her children," she had failed to achieve the requisite degree of personal rehabilitation necessary to satisfy the requirements of § 17a-112 (b) (2). After considering each of the seven factors enumerated under § 17a-112 (d),[31] the trial court then found, by clear and convincing

---

[31] As required by § 17a-112 (d), the trial court made the following written findings regarding each of the seven factors:

"(1) The [d]epartment . . . has offered appropriate and timely services for transportation for visitation, for psychiatric counseling, for alcohol and drug treatment, and support services such as a parent aide, outpatient psychiatric services through Manchester Memorial Hospital, the Horizons program, the Exchange Club, Genesis, the Village for Families, [t]he Family Support Center, and pastoral counseling.

"(2) The court finds that the [d]epartment . . . has made reasonable efforts given the situation and circumstances to provide counseling for Ann [F.], which she has continuously utilized. Efforts to reunite the child, Eden, with Ann [F.], were made in February, 1995. The child was subsequently

evidence, that it is "in the best interests of Eden and

removed in March, 1995. Even the mother agreed that Eden was too difficult for her to control. The [d]epartment has unintentionally allowed an inordinate period of time, three and [one-half] years, for Ann [F.] to acquire the skills and stability to effectively parent these children. The mother simply does not have the intellectual or emotional wherewithal to raise these two children.

"(3) Regarding court orders, fulfillment of obligations, expectations and the like: The court finds that court approved expectations have urged Ann [F.] to secure and maintain clean, safe and adequate housing, which she has substantially done; to attend visitation sessions as often as permitted, which she has done; and to participate in individual counseling and day treatment, which she has done.

"(4) The children's feelings and emotional ties with the biological parent and foster parents were fully considered by the court. The children are clearly bonded to their foster family. The court-appointed psychologist . . . Mantell, reports that the foster parents are the psychological parents to the children. There is no parental-child bonding. [According to Mantell] '[t]here is some evidence of a more distant bonding between [Ann F.] and Eden with great conflict and dissatisfaction in the relationship, particularly on Eden's side.' . . .

"(5) With respect to the age of the children, Eden turned eight on July 2, 1996. [As of the date of this decision, August 5, 1996] Joann is nearly four years of age. These children require stability in their lives, a time to heal without the fear of having to live with Ann [F.], and an affirmation by this court that they have a permanent home. Leaving these children in legal 'limbo' would hardly be in their best interest. A three and [one-half] year delay in bringing finality to this placement decision is inordinately long.

"(6) With respect to the efforts [Ann F.] has made to adjust her circumstances, conduct or conditions to make it in the best interests of the children to return to her home in the foreseeable future, the court finds that Ann [F.] has not demonstrated the parenting abilities in the past, and, given her optimal state of her therapeutic gains, she does not demonstrate even now, adequate understanding of Eden's needs or an ability to engage Joann in any way other than as a playmate. . . . Sadler indicated that '[i]ncremental gains may well be made over the years, although it is exceedingly unlikely . . . that [Ann] F. will undergo any dramatic or substantial improvement either in her individual functioning or in her parenting abilities.' . . . Further delay in providing permanency to these children's family structure would be inappropriate.

"(7) With respect to any barriers which may have reasonably or unreasonably been placed in the path of Ann [F.] to prevent a meaningful relationship with the children, the court finds that the [d]epartment . . . has met its obligations to Ann [F.] by repeatedly offering a variety of services and treatment modalities to her. One of the few consistencies in Ann [F.'s] life appears to be her consistent willingness to undergo treatment for her mental

Joann to terminate the parental rights of their biological parents so that the children may be placed in adoption, or that other permanent planning be accomplished without further delay."

### A

We first address Ann F.'s claim that the trial court reasonably could not have found that she had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time, she could assume a responsible position with respect to the care of her children. See General Statutes § 17a-112 (b) (2). We disagree with Ann F.'s contention.

"On appeal, we review a trial court's finding that a parent has failed to rehabilitate herself in accordance with the rules that apply generally to a trier's finding of fact. We will overturn such a finding of fact only if it is clearly erroneous in light of the evidence in the whole record. *In re Luis C.,* [supra, 210 Conn. 166]." *In re Romance M.,* 229 Conn. 345, 353, 641 A.2d 378 (1994). "[G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's

health problems. She has gone to individual, parental and family support counseling. Notwithstanding the multitude of counseling services in which she has participated, she still lacks the judgment, patience, and skills necessary to parent. [According to Sadler's report of October 7, 1995, Ann F.] 'has herself consistently and vigorously and successfully continued to engage in behaviors that have maintained the chaos and disruptions in her life. [Ann] F. has selected companions who do not support her parenting and she has demonstrated no improvements in her parenting abilities that would encourage any hope that she will develop parenting abilities in the future that she has never demonstrated in the past.' "

ruling." (Citations omitted; internal quotation marks omitted.) *In re Jessica M.*, 49 Conn. App. 229, 235–36, 714 A.2d 64, cert. granted, 247 Conn. 915, 722 A.2d 806 (1998).

" 'Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable 'within a reasonable time.' " *In re Marvin M.*, 48 Conn. App. 563, 578, 711 A.2d 757, cert. denied, 245 Conn. 916, 719 A.2d 900 (1998). " 'Rehabilitate' means 'to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation.' [Webster's] Third New International Dictionary. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." *In re Juvenile Appeal (84-3)*, 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).

Our review of the record reveals that the evidence credited by the trial court supports its conclusion that Ann F. had failed to attain a degree of rehabilitation sufficient to warrant the belief that, at some time in the foreseeable future, she would be capable of assuming a responsible position with respect to her children's care. The trial court reasonably relied on the testimony of the three experts, Spudic, Mantell and Sadler, each of

whom concluded that, in light of the serious and chronic nature of Ann F.'s mental illness, her future prospects for assuming a responsible parenting role for her children are bleak. See *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 667, 420 A.2d 875 (1979) (in termination proceeding, "[p]sychological testimony from professionals is rightly accorded great weight"). Moreover, each of those experts had spent a considerable amount of time evaluating Ann F. and her capacity to reestablish a position of responsibility in the lives of her children. Consequently, the record contains sufficient facts to support their professional opinions.[32]

Ann F. points to certain evidence adduced during the trial tending to establish that, over the years, she has made progress in coping with both her illness and her children.[33] Indeed, the evidence does suggest that Ann F. has achieved a level of stability within her limitations. This fact, coupled with Ann F.'s sincere love for her daughters, evokes genuine sympathy for Ann F. and for

---

[32] Ann F. contends that, at trial, she elicited certain concessions from Sadler that weakened the persuasive force of his testimony. Specifically, she notes that the social study report prepared by Crosby did not contain certain historical information helpful to Ann F., and that Sadler, who acknowledged that he had relied on the report, stated that he would have found the omitted information "very important." Notwithstanding that testimony, however, Sadler never changed his opinion that, in all likelihood, Ann F. never would be able to assume a responsible position in the lives of her children. The trial court, therefore, was entitled to give Sadler's opinion whatever weight it deemed appropriate.

[33] For example, Ann F. relies on the fact that she was able to care for Eden without serious incident during the three week period immediately preceding the date on which the department finally removed Eden from Ann F.'s care. The trial court, however, was free to conclude that Ann F. had demonstrated poor judgment when she went out to play bingo and left Eden with two men, one of whom she hardly knew, who left Ann F.'s home strewn with beer cans and allowed Eden's room to be "trashed" while she was in their care.

her efforts at rehabilitation.[34] Nevertheless, in light of all the evidence, including the uncontroverted opinions of Spudic, Mantell and Sadler, we cannot say that the trial court was clearly erroneous in concluding, by clear and convincing evidence, that Ann F. had failed to reach such a degree of rehabilitation as would encourage the belief that, within a reasonable period of time, she could assume a responsible position in the lives of her children.[35]

B

Ann F. also claims that the evidence did not support the trial court's finding that termination of her parental rights with respect to Eden was in Eden's best interest. Specifically, Ann F. contends that the termination of a child's relationship with his or her parents cannot be in that child's best interest unless the purpose is to free the child for adoption. Because Eden's foster parents would not commit themselves to adopting Eden, and

[34] As Mantell, the court-appointed psychologist, noted in one of his reports: "This is a sad and tragic case. . . . I would like to believe that there might have been something that could have been done to reverse this process. Regrettably, [Ann F.] seems to be tragically disabled by the combination of the psychosocial compromises of her childhood and her chronic mental disorder. The quality of her adjustment at any point is fragile, the risk of decompensation ever present, and her prospects are quite dim." This observation is quoted by the trial court in its memorandum of decision.

[35] At trial, Ann F. claimed that there exists a "strong bias against parents [with] mental illness," and that Ann F. herself had been "battl[ing]" such bias in connection with this case. Ann F., however, makes no such claim on appeal. Of course, any such bias would be intolerable, and vigilance must be exercised to ensure that the parental rights of mentally ill persons are afforded the full protections provided under our stringent statutory scheme. See generally, e.g., R. Sackett, "Terminating Parental Rights of the Handicapped," 25 Fam. L.Q. 253 (1991); P. Bernstein, "Termination of Parental Rights on the Basis of Mental Disability: A Problem in Policy and Interpretation," 22 Pac. L.J. 1155 (1991); see also M. Perlin, "The ADA and Persons with Mental Disabilities: Can Sanist Attitudes Be Undone?," 8 J.L. & Health 15 (1994).

because there is no guarantee that an alternative adoptive family will be found,[36] Ann F. asserts that the trial court's conclusion that Eden's best interest will be served by the termination of Ann F.'s parental rights was clearly erroneous. We disagree.

Although subsequent adoption is the preferred outcome for a child whose biological parents have had their parental rights terminated; *In re Juvenile Appeal (83-BC)*, 189 Conn. 66, 79, 454 A.2d 1262 (1983); accord *In re Baby Girl B.*, 224 Conn. 263, 274, 618 A.2d 1 (1992); it is not a necessary prerequisite for the termination of parental rights. While long-term stability is critical to a child's future health and development; *In re Romance M.*, supra, 229 Conn. 356; adoption provides only one option for obtaining such stability. In this case, Eden's foster parents, despite hesitancy about committing themselves to adopting Eden, have indicated a willingness to provide Eden with a permanent foster home, assuming that such a placement is determined to be in Eden's best interest. In light of this testimony, the trial court reasonably could have concluded that the possibility of a permanent placement with Eden's current

[36] Testimony was adduced at trial regarding the possible permanent placements of Eden and Joann if and when Ann F.'s parental rights with respect to the two children are terminated. With respect to Joann, the testimony established that her foster parents almost certainly will seek to adopt her. Due largely to Eden's "long history of behavioral problems including aggression, impulsivity and defiance," however, her adoptive status is less clear. At trial, Eden's foster mother testified that "we would like to offer Eden a permanent home. I am not going to commit to adoption at this point because we feel there are a lot of issues involved and we would like to talk to the therapeutic community before we make a definite decision. . . . [W]e just want to make sure that we have the best atmosphere for her to be able to grow into a healthy adult." The foster mother also indicated that, even if she did not seek to adopt Eden, she nevertheless wanted Eden to remain in her home. The foster mother acknowledged, however, that there were times when she thought that she might not be able to keep Eden in her home due to Eden's behavioral problems. In addition, both Mantell and Crosby indicated that children with problems such as Eden's are less likely to be adopted than children who do not pose such problems.

foster family was preferable to the continuing uncertainty of the status quo.

Moreover, the trial court properly considered each of the factors enumerated in § 17a-112 (d), and thoroughly documented its conclusions regarding those factors. See footnote 31 of this opinion. Those conclusions, which need not be repeated here, are fully supported by the record. Consequently, we are persuaded that, in light of all the relevant facts and considerations, including Eden's special needs and Ann F.'s demonstrated inability to meet them, Eden's need for permanency and stability, her bond with her foster family and her age, the trial court's conclusion that the commissioner had demonstrated, by clear and convincing evidence, that the termination of Ann F.'s parental rights was in Eden's best interest was not clearly erroneous.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgments of the trial court.

In this opinion CALLAHAN, C. J., and BORDEN, J., concurred.

MCDONALD, J., with whom BERDON, J., joins, dissenting. I would uphold the Appellate Court's decision that: (1) the trial court was required to find, by clear and convincing evidence, that the department of children and families (department) had made reasonable efforts to reunify the respondent mother, Ann F., and her children, Eden and Joann, before terminating Ann F.'s parental rights; and (2) the trial court's determination that such efforts were made was clearly erroneous. I also disagree with part II of the majority opinion, regarding whether Ann F. had rehabilitated herself, and whether the termination of her parental rights with respect to Eden was in Eden's best interest. Accordingly, I dissent.

## I

The Appellate Court held that, prior to terminating Ann F.'s parental rights, the trial court was required to find, by clear and convincing evidence, that the department had made reasonable efforts to reunify Ann F. with both of her children, Eden and Joann. See *In re Eden F.*, 48 Conn. App. 290, 310–11, 710 A.2d 771 (1998). The trial court had made findings regarding the department's efforts to reunify the family, but the Appellate Court concluded that the findings were not supported by clear and convincing evidence in the record. Id., 322. The Appellate Court found that the department had failed to implement properly a plan to reunify Ann F. with Eden; id., 317–19; and that the department had made no efforts at all to reunify Ann F. with Joann. Id., 319–20.

The majority reverses the Appellate Court judgment, holding that the petitioner, the commissioner of children and families (commissioner), was not required to prove, by clear and convincing evidence, that the department had made reasonable efforts to reunify Ann F. and her children. The majority holds, instead, that a trial court may terminate parental rights if it determines, by clear and convincing evidence, that the termination is in the child's best interest, after considering the seven factors delineated in General Statutes (Rev. to 1995) § 17a-112 (d).[1] I disagree.

[1] The majority cites *In re Christine F.*, 6 Conn. App. 360, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986), in which the Appellate Court upheld the trial court's termination of parental rights "[n]otwithstanding the positive relationship between the mother and child . . . ." Id., 369. In that case, the Appellate Court stated that, because "the record reveals that the trial court's *ultimate conclusions* are supported by clear and convincing evidence, [it would] not reach an opposite conclusion on the basis of any one segment of the many factors considered in a termination proceeding . . . ." (Emphasis added; internal quotation marks omitted.) Id., 370. This court is not bound by this Appellate Court case and I would decline to follow it, to the extent that it suggests that each one of the seven factors enumerated in General Statutes (Rev. to 1995) § 17a-112 (d) need not be established by clear and convincing evidence.

The termination of a parent's legal rights is "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his or her parent. It is, accordingly, a most serious and sensitive judicial action. *Anonymous* v. *Norton*, 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975)." (Internal quotation marks omitted.) *In re Baby Girl B.*, 224 Conn. 263, 279, 618 A.2d 1 (1992). The United States Supreme Court has recognized that "a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." (Internal quotation marks omitted.) *Santosky* v. *Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). "If the State prevails, it will have worked a unique kind of deprivation. . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." (Internal quotation marks omitted.) Id., 759. For these reasons, the United States Supreme Court held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." Id., 747–48. The clear and convincing standard is "necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with a significant deprivation of liberty . . . ." (Internal quotation marks omitted.) Id., 756.

I read *Santosky* to require the department to establish, by at least clear and convincing evidence, the conditions for the termination of parental rights. Under the revision of § 17a-112 (d) (2) in effect at the time of trial, the court was required to consider and make written findings regarding whether the department had made

reasonable efforts to reunite the family before terminating Ann F.'s parental rights.[2] I would find that the department was required to make such reasonable efforts as a condition of terminating parental rights and that the commissioner was required to prove, by clear and convincing evidence, that those efforts were made. The statute's requirement that the court consider and make written findings regarding such reasonable efforts supports this conclusion. Any civilized and common sense reading of the requirements to forever cut off a parent's relationship with a child dictates this conclusion.

Be there any question, the legislature, in enacting Public Acts 1995, No. 95-238, § 3,[3] made clear that such a finding was required for the termination of parental rights. This amendment to § 17a-112 became effective before the trial in this case. Because the amendment was labeled procedural in the legislative history; see 38 H.R. Proc., Pt. 10, 1995 Sess., p. 3736, remarks of Representative Richard D. Tulisano; and referred to as one that "clarifies" the statute; 38 H.R. Proc., Pt. 17, 1995 Sess., p. 6126, remarks of Representatives John W. Thompson and Tulisano; the amendment should have applied to Ann F.'s termination proceedings. See *Miano* v. *Thorne*, 218 Conn. 170, 175, 588 A.2d 189 (1991).

---

[2] One of the criteria for the termination of parental rights enumerated in the statute provides that "the [trial] court shall consider and shall make written findings regarding . . . (2) whether the department . . . has made reasonable efforts to reunite the family pursuant to the federal [Adoption Assistance and] Child Welfare Act of 1980, as amended . . . ." General Statutes (Rev. to 1995) § 17a-112 (d) (2).

[3] Public Acts 1995, No. 95-238, § 3, provides in relevant part: "Section 17a-112 of the general statutes is repealed and the following is substituted in lieu thereof . . .

"(b) The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant [a] petition [to terminate parental rights] if it finds THAT THE DEPARTMENT OF CHILDREN AND FAMILIES HAS MADE REASONABLE EFFORTS TO REUNIFY THE CHILD WITH THE PARENT . . . ."

Moreover, the federal Adoption Assistance and Child Welfare Act of 1980 (federal act), 42 U.S.C. § 670 et seq., requires the state to facilitate the reunification of the family in order to qualify for federal funding.[4] The use of the federal spending power as a "carrot" or "stick" to force state action repeatedly has been recognized in United States Supreme Court decisions. See, e.g., *South Dakota* v. *Dole*, 483 U.S. 203, 208–209, 107 S. Ct. 2793, 97 L. Ed. 2d 171 (1987). The majority accepts the commissioner's argument that the federal act is "an appropriations act." In truth, the department, for years, has complied with the federal act. The department has submitted a plan providing for such efforts, which was approved by the secretary of health and human services, and has accepted the federal funds.[5] Moreover, the department's policy manual, which was in effect in 1995 when the petitions to terminate Ann F.'s parental rights were filed, provides that "[the department] requires that 'reasonable efforts' be made in every case to prevent unnecessary placement or return the child to the family,

---

[4] Specifically, the federal act provides in relevant part: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the [s]ecretary [of health and human services] which—

\* \* \*

". . . provides that, in each case, reasonable efforts will be made . . . prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and . . . to make it possible for the child to return to his home . . . ." 42 U.S.C. § 671 (a) (15) (1994).

[5] See Connecticut Bar Association, Juvenile Law Handbook (S. Bysiewicz ed., 1984) pp. 3–4 ("[a]lthough Connecticut statutes do not explicitly require that reasonable efforts are made to maintain familial integrity, the Department of Health and Human Services has determined that Connecticut is in substantial compliance with Title IV-E of the Social Security Act [42 U.S.C. §§ 670 through 676]").

In fiscal year 1994–95, the department received more than $51 million from the federal government for foster care and adoption assistance under the federal act. See State of Connecticut, Single Audit Report for the Fiscal Year Ending June 30, 1995: Schedule of Federal Financial Assistance, p. E-10.

*as required by federal law.*" (Emphasis added.) Department of Children and Families Policy Manual (November, 1994) § 46-3-6, p. 1 (Policy Manual).[6] It is difficult, to say the least, to reconcile the department's determination in the policy manual that federal law requires reasonable efforts and the department's receipt of federal funds—based on compliance with the federal act—with the commissioner's argument in this court.

Finally, I cannot imagine that the citizens of this state, or those of the United States, would countenance the termination of parental rights without a requirement of reasonable efforts on the part of a state agency to attempt to reunify a mother with her daughters. Such a requirement, I believe, is expressed both in the federal and state constitutions and required in a decent society concerned with a mother's most fundamental right to her children. In this case, Ann F., although mentally impaired, loves and wants her children, and she deserves the protection of due process before her rights to her daughters are severed permanently.

---

[6] According to the Policy Manual, "[r]easonable efforts require: services to families/children which would prevent out-of-home placement or allow reunification with the family, and documentation by [the department] of the above services that will enable the Court to make a judicial determination that reasonable efforts were made.

"The following are examples of some of the intensive family preservation/reunification services that might be used to prevent out-of-home placement and to facilitate reunification of children in out-of-home care with their families:

"intensive family preservation services

"twenty-four (24) hour emergency caretaker and homemaker services

"day care

"crisis counseling

"individual and family counseling

"emergency shelters

"self-help groups

"services to unmarried parents

"provisions of, or arrangements for, mental health services

"drug and alcohol abuse counseling [and]

"services for foster parents." Policy Manual, supra, § 46-3-6, p. 1.

Because the majority concludes that the trial court was not required to find, by clear and convincing evidence, that the department had made reasonable efforts to reunify the family, it does not review the trial court's conclusion to that effect. I would affirm the Appellate Court's careful, detailed and proper decision that the trial court's conclusion was not supported by clear and convincing evidence. *In re Eden F.*, supra, 48 Conn. App. 317, 322.

As the Appellate Court noted, the department's plan for reunification "lacked planning on a number of critical issues . . . ." Id., 317. Ann F. never was afforded a fair chance to succeed with Eden. When the department reunified Ann F. with Eden on February 27, 1995, Eden's own significant psychological and behavioral needs still were formally being assessed. Id., 296. The department chose not to wait for the results of this assessment, and proceeded with the reunification despite the ongoing evaluation of Eden.[7] Id., 296, 319. Ann F. and her support service providers, i.e., her therapist and department case manager, were not informed of the reunification with Eden until the actual day on which it occurred. The commissioner provided a crisis telephone line for Ann F.; however, when she placed a telephone call to the department, no one returned her call for five days. Id., 297 & n.11. The department also provided Ann F. with a parent aide, but the aide only visited twice over the course of the month. Id., 297 & n.9. When Eden returned to live with Ann F., the department had not enrolled Eden in school, and Eden did not have her usual therapeutic services for most of the reunification period. Id., 296–97. Ann F. was not provided with any respite and, because Eden was not attending school,

---

[7] Eden eventually was "diagnosed with Reaction Attachment Disorder compounded by symptoms of depression, behavioral disturbance, including oppositionality and defiance." *In re Eden F.*, supra, 48 Conn. App. 296.

Ann F. had to care for her, seven days a week, twenty-four hours a day, for three weeks. Id., 297, 318. Ann F. was programmed for failure. The end came when Ann F. went out to play bingo with a friend and left Eden in the care of two people. Id., 297. When the department learned that Eden's bedroom was "trashed" that evening, and that the babysitters had been drinking beer in the apartment, it removed Eden from Ann F.'s care. Id., 297–98.

The department did not demonstrate any efforts, whatsoever, to reunify Ann F. with her youngest child, Joann, despite the fact that Joann did not share her sister Eden's functional problems and would have been easier to handle. Id., 319–20.

Because the department did not properly implement the plan to reunify Ann F. with Eden and did not make *any* efforts to reunify Ann F. with Joann, I would affirm the judgment of the Appellate Court reversing the judgments of the trial court and order the trial court to restore Ann F.'s parental rights.

II

The majority reaches two additional issues that were not decided by the Appellate Court: First, whether the trial court improperly found that Ann F. had failed to rehabilitate herself and, second, whether the trial court improperly concluded that the termination of Ann F.'s parental rights was in Eden's best interest.

The trial court found that it had been proven, by clear and convincing evidence, that Ann F. had failed to rehabilitate herself. However, "[t]he statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by

available support systems." *In re Juvenile Appeal (84-3)*, 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). I would conclude that General Statutes (Rev. to 1995) § 17a-112 (b) (2) does not require Ann F. to rehabilitate herself to the degree that she can care for her children without assistance.

Under this standard, I believe that it was an abuse of discretion for the trial court to find that Ann F. had not rehabilitated herself. The majority stresses that "the trial court reasonably relied on the testimony" of David Mantell, a clinical psychologist, and other expert witnesses in reaching its conclusion. I disagree that such reliance was reasonable.[8]

---

[8] Mantell frequently testifies as a court-appointed expert in termination cases involving the mentally ill, as he did in this case. See, e.g., *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 642–43, 436 A.2d 290 (1980) (Mantell recommending termination of psychologically impaired parent's rights); *In re Pascacio R.*, 52 Conn. App. 106, 111–12 & n.4, 726 A.2d 114 (1999) (same); *In re Anna B.*, 50 Conn. App. 298, 305, 307, 717 A.2d 289 (1998) (same); *In re Christina V.*, 38 Conn. App. 214, 217–18, 660 A.2d 863 (1995) (same); cf. *In re Michael M.*, 29 Conn. App. 112, 116–17, 614 A.2d 832 (1992). His objectivity recently was questioned by the Appellate Court, which concluded that the trial court should have struck his testimony because he simultaneously worked both as the court-appointed evaluator and as an evaluator for the state. *In re David W.*, 52 Conn. App. 576, 590, 727 A.2d 264, cert. granted, 249 Conn. 907, 733 A.2d 225 (1999).

Commentators have recognized that psychological evaluations such as Mantell's often are erroneous. "The psychiatric profession does not possess the necessary tools for the specific task of predicting future behavior with certainty. As one article stated, '[t]he studies . . . indicate that psychiatrists often disagree in their judgments and that even where they do agree those judgments—*especially predictive judgments*—are often wrong.' [B. Ennis & T. Litwack, "Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom," 62 Cal. L. Rev. 693, 719 (1974).] . . . Reliance on these evaluations as a basis for terminating parental rights introduces an unacceptable element of chance. The severe intrusion on the rights of the parent is not outweighed by a compelling state interest if the state action will be wrong as often as it is right." (Emphasis in original.) P. Bernstein, "Termination of Parental Rights on the Basis of Mental Disability: A Problem in Policy and Interpretation," 22 Pac. L.J. 1155, 1176–77 (1991). For these reasons, I believe that it was an abuse of discretion for the trial court to rely on Mantell's testimony in terminating Ann F.'s parental rights.

There was no evidence at trial from which the trial court reasonably could have concluded that Ann F. could not care for Eden and Joann with reasonable assistance. No witness testified that, even with assistance and the required services, Ann F. would never be able to care for her daughters.[9] The reports of Thomas Spudic, a psychologist who worked with Ann F. and her children, noted that Ann F. had made "considerable progress in her ability to stay focused, to speak coherently about her problems, and in her ability to relate to Eden." Spudic concluded that, while he questioned Ann F.'s ability *at that time* to care for her children on a *full-time basis*, he was "very impressed with her genuine love for these children and her desire to be with them." Spudic noted that Ann F. had a "heart of gold."

Moreover, Ann F. had cared for Eden, a problem child, for three weeks without respite and without reasonable assistance. If the department had provided the proper support services to Ann F. during her reunification with Eden, as required by 42 U.S.C. § 671 (a) (15), by placing Eden in school, providing Eden with her regular counseling services and offering respite to Ann F., perhaps, Ann F. would not have been forced to leave Eden as she did that one evening when she went to play bingo.

I agree with the Appellate Court that the department, in seeking to terminate the right to parent, is capable of amassing substantial resources. "[I]n matters of termination of parental rights, the department occupies a

---

[9] Rather, the expert witnesses that favored termination focused on the fact that Ann F. could not care for the children *on a full-time basis at that time*. Kenneth Crosby, a department social worker, testified to the effect that Ann F. was not capable of taking care of the children *on a full-time permanent basis*. Richard Sadler, a psychiatrist, testified to the effect that Ann F. could not parent the children *independently*. No witness stated that Ann F. could never be a successful parent, if provided with the statutorily required assistance and services.

superior position. . . . [T]he parties are by no means dealing on an equal basis. The parent is by definition saddled with problems: economic, physical, sociological, psychiatric, or any combination thereof. The agency, in contrast, is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority [are] obligatory." (Internal quotation marks omitted.) *In re Eden F.*, supra, 48 Conn. App. 312. Given the inequality of resources in this case, I do not believe that the department proved, by clear and convincing evidence, that Ann F. had failed to rehabilitate herself to the extent that, with the necessary support services and assistance, she could play a useful role in her daughters' lives.

I also believe that the trial court's conclusion that terminating Ann F.'s parental rights with respect to Eden was in Eden's best interest was clearly erroneous. Although long-term stability is critical to a child's future health and development, there was no prospect at the time of trial that Eden would be adopted by her foster parents. Eden's sister, Joann, however, may be adopted by her current foster family. Watching her sister be adopted, while she is not, and having her mother's parental rights terminated, may be a cruel experience for Eden. It is not disputed that Eden, who was seven years old at the time of trial, had formed a bond with Ann F. over the years. Under the circumstances, it is not in Eden's best interest to terminate her legal relationship with Ann F., and then have Eden watch her sister be adopted while she is not.

This is a tragic and difficult case that will have a long-standing, future effect upon parents with mental disabilities. The courts may have "[little] experience in the area of terminating parental rights of handicapped parents." R. Sackett, "Terminating Parental Rights of the Handicapped," 25 Fam. L.Q. 253, 253 (1991). "Handicapped persons do not generally comply with society's

stereotype of a parent. The handicapped parent's parenting skill may therefore be assessed under standards that result in him or her being considered an inadequate parent because he or she is handicapped." Id., 272. Adding to this difficulty is the fact that Ann F. suffers from a mental illness. "Surveys show that mental disabilities are the most negatively perceived of all disabilities." M. Perlin, "The ADA and Persons with Mental Disabilities: Can Sanist Attitudes Be Undone?" 8 J.L. & Health 15, 26 (1994).

"Ultimately, the question is whether the parent is inherently unable to fulfill [her] responsibilities or the state has failed to provide adequate services or training to enable [her] to do so." D. Forman, Every Parent's Guide to the Law (1998) p. 311. While I respect the majority's efforts and conclusions as we all try to bring justice to Ann F. and her children, the fact remains that Ann F. tried to be a mother within the confines of her disabilities. She demonstrated that she cared deeply for her children and wanted to parent them as best she could. Forbidding her from ever doing so, without giving her a fair chance to try, violates both Ann F.'s rights and the rights of her children. In a world in which children are abused, neglected and abandoned every day, it is sad that Ann F., a caring mother with a "heart of gold," who may have the potential to play an important role in her daughters' lives, has been stripped of her right to be a parent without having a fair chance to prove herself capable. Ann F.'s last act as a mother is fighting to remain in her daughters' lives. Perhaps, this, in itself, will give a small measure of comfort to them, particularly to Eden.

Accordingly, I respectfully dissent.

BERDON, J., dissenting. I agree with now Chief Justice McDonald's well reasoned dissent regarding the termination of the parental rights of the respondent mother, Ann F., with respect to her two daughters, Eden F. and Joann F. Indeed, this is one of those cases where the split decision of the court, carried by a bare majority of a five justice panel, is so outrageous and heartbreaking that Ann F.'s motion to reargue en banc[1] prompted the filing of three applications for permission to appear as amici curiae and file briefs in support of Ann F.'s motion to reargue before a full court of seven justices and also to file briefs on the merits in support of Ann F., had her motion to reargue been granted. Those applications were filed by the state office of protection and advocacy for persons with disabilities,[2] Connecticut Legal Services, Inc.,[3] and the Connecticut Legal Rights Projects, Inc., together with the Mental Health Association of Connecticut, Inc., Connecticut Protection and Advocacy for Individuals with Mental Illness Advisory Council, Advocacy Unlimited, Inc., and

---

[1] This dissent was filed subsequent to the denial of the motion to reargue.

[2] The state office of protection and advocacy for persons with disabilities advocates for the rights of persons with disabilities. The agency is concerned that, first, the court's decision negatively impacts upon the rights of disabled parents to raise their children by allowing for the termination of parental rights based upon the parents' disability status. This is contrary to the legislature's intent that the state provide services to reunify and strengthen families regardless of parents' disability. Second, the majority's decision affects the rights of children with disabilities to remain with their families. The state's removal of the disabled child in this case, given the familial relationship and the difficulties in arranging adoptions for disabled children, is not in the child's best interest. Finally, the majority's decision fails to recognize that parents and children with disabilities constitute a protected class under both federal and state civil rights laws. The agency argues, however, that the Appellate Court's decision is not narrowly tailored to serve the state's compelling interest in protecting children. Furthermore, the state's efforts to reunify the family did not offer equal protection to the disabled parent and child in this case.

[3] Connecticut Legal Services, Inc., which represents indigent parents with disabilities, raises concerns about the rights of disabled parents in the termination of parental rights cases.

the Connecticut Consortium of Women and Children with Behavioral Needs.[4]

The critical issue in this three to two decision was whether the state was required to prove, by *clear and convincing evidence*, that the commissioner of children and youth services, now the commissioner of children and families (commissioner), made reasonable efforts to reunite Ann F. with Eden F. and Joann F., as the Appellate Court unanimously ruled in its well reasoned opinion in *In re Eden F.*, 48 Conn. App. 290, 710 A.2d 771 (1998). I join Chief Justice McDonald in his dissent because, in my view and contrary to the majority, General Statutes (Rev. to 1995) § 17a-112 requires that the commissioner must prove by clear and convincing evidence that termination is in the child's best interest and that the commissioner made reasonable efforts to reunite the family.

---

[4] These various Connecticut nonprofit organizations advocate on behalf of persons with mental health disabilities. Their concern is that the majority's decision interferes with the rights of disabled parents to maintain or reestablish their familial relationships. This, they argue, violates various federal and state civil rights laws that protect the rights of the family and the disabled. They critique the majority's focus on whether the amendment to General Statutes (Rev. to 1995) § 17a-112; see Public Acts 1995, No. 95-238, § 3; was substantive or procedural. Furthermore, they assert, given the fundamental rights of the respondent mother and her children to maintain their familial relationship, the court should have applied the *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), test to ascertain if there was sufficient procedural due process protection. Under the *Mathews* test, (1) the right to parent is fundamental, (2) there is a risk of erroneously depriving the parent and children of the familial relationship, and (3) the state's interest in preserving families is more important than the state's burden of providing additional due process protections. There is insufficient evidence, these agencies argue, that the state made reasonable efforts to reunify Ann F. and her children before terminating her parental rights. In addition, the state's treatment of the disabled mother may implicate federal and state civil rights laws. Finally, these agencies point out that the state did not protect the rights of the children to maintain their familial relationships. In particular, the state did not act in the best interest of the disabled child, Eden, given the existing parent-child relationship and the potential difficulties of finding adoptive parents.

Furthermore, both the federal and state constitutions require that the state provide sufficient due process protection before terminating parental rights. "The standard of proof applicable to a proceeding for the termination of parental rights is that of 'clear and convincing evidence.' *Santosky* v. *Kramer*, [455 U.S. 745, 748, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)]. The *Santosky* court said, 'We hold that such a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process.' Id., 769." *In re Eden F.*, supra, 48 Conn. App. 308. Indeed, this court recognized "that due process requires the state to prove the allegations in a petition to terminate parental rights by clear and convincing evidence before those rights could be terminated." *In re Juvenile Appeal (83-AB)*, 189 Conn. 58, 60, 454 A.2d 271 (1983).

Nevertheless, under the facts of this case, as pointed out by Chief Justice McDonald in his dissent, it is clear that the commissioner failed even to demonstrate by a preponderance of the evidence that he made reasonable efforts to reunite the family. Not only does this violate the constitutional rights of Ann F. and her children, it flies in the face of a 1995 amendment[5] to § 17a-112, which statutorily reinforces these constitutional rights. The majority waltzes around this amendment by concluding, in a hypertechnical ruling, that because the amendment was adopted subsequent to the filing of the petition for termination, it was not applicable. Although it is correct that the amendment did not become effective until after the petition was filed, it was effective

---

[5] Public Acts 1995, No. 95-238, § 3, provides in relevant part: "Section 17a-112 of the general statutes is repealed and the following is substituted in lieu thereof . . .

"(b) The superior court, upon hearing and notice as provided in sections 45a-716 and 45a-717, may grant such petition [to terminate parental rights] if it finds that *the Department of Children and Families has made reasonable efforts to reunify the child with the parent* . . . ." (Emphasis added.)

at the time of the hearing on the petition and was ignored by the trial court.

In affirming by only one vote the trial court's decision to terminate Ann F.'s parental rights with respect to her two children and by refusing to allow for reargument before an en banc court, this court not only demonstrates a lack of sensitivity, but also ignores the fundamental constitutional right of the family to be free from government interference. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need of procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Santosky* v. *Kramer*, supra, 455 U.S. 753–54.

It seems incredible to me that the majority of this court would reverse a unanimous Appellate Court panel and let stand a three to two decision of this court involving such a sensitive matter that implicates fundamental constitutional rights of the family without ordering reargument before an en banc court. It is because of this seeming indifference that I remind the majority of this court of the sanctity of the parent-child relationship and that the state is required, by the constitution and by statute, to prove that every effort was made to support the reunification of a parent and her children before terminating their relationship.

Accordingly, I dissent.