MEMORANDUM OF DECISION
This memorandum of decision addresses a petition for termination of the, parental rights (TPR) of John W. and Ronda F., the biological parents of Sarah W., who was born February 1998. The Department of Children and Families (DCF) filed this TPR petition on October 18, 2000 alleging the ground of failure to rehabilitate against both parents. As to John W., the petition also alleges that Sarah is under seven years of age, and this respondent is the parent of another child to whom his parental rights were previously terminated.
The history of this matter reflects that on September 25, 1998, the court granted DCF's request for an Order of Temporary Custody (OTC) regarding Sarah. On that date, the court also ordered specific steps for reunification as to John W. and Ronda F. (Swienton, J.; Exhibit 8.) On November 18, 1998, the court vacated the OTC and returned Sarah to her parents' care. (Swienton, J.) On November 30, 1998, following a court hearing, Sarah was adjudicated a neglected child, upon allegations that she was neglected and uncared for while in the care and custody of John W. and Ronda F. The court reaffirmed the specific steps, and Sarah was permitted to remain with her parents under protective supervision. (Swienton, J.; Exhibit 8.)
On June 22, 1999, DCF applied for another OTC and submitted a motion to modify protective supervision to commitment. On July 12, 1999, the court granted the motion for modification, and Sarah was removed from the home and committed to DCF custody for a period of twelve months. (Foley, J.; CT Page 12672 Exhibit 8.) Sarah has remained in DCF custody thereafter, pursuant to court-ordered extensions of commitment. On August 9, 2000, after hearing, the court determined that efforts to reunify John W. and Ronda F. with Sarah were no longer appropriate. (Trombley, J.)
This highly contested TPR trial was conducted on June 4, 5, 6, and 7, 2001. The respondent parents were present and were vigorously represented by counsel at each court session, as were the petitioner and the minor child.[2] All counsel submitted thorough and detailed post-trial briefs in lieu of argument, received by the court on or before June 29, 2001.
The Child Protection Session of the Superior Court, Juvenile Matters division, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of this child.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions and the multiple other documents in evidence, which included psychiatric and psychological reports, treatment records; and social study materials.[3]
The court has utilized the applicable legal standards[4] in considering this evidence and the testimony of trial witnesses, who included family members, a parenting educator, a DCF staff member, a psychiatrist, a psychologist, therapists and other health care providers.[5] Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial:
I. A. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF NOVEMBER 30, 1998
John F., the respondent father, was born June 9, 1961. A high school graduate, John W.'s passive disposition and poor hygiene have persistently interfered with his interpersonal relationships. (Exhibits 4, E, E2.) Until he reached his thirties, John W. abused alcohol, marijuana, cocaine, and amphetamines. (Exhibit 5.) He has suffered from depression, borderline personality disorder, asthma, sleep apnea, diabetes, degenerative disc disease, and disability of the knee. John W. recently applied for SSI total disability benefits. (Exhibits 4, A, B.)
Ronda F., the respondent mother, was born on April 20, 1973. She left school at age 16, and earned her G.E.D. She married in 1992, before meeting John W.; she had three children, all boys, in the course of that prior union. (Exhibit 22.) Ronda F. has been employed as a house cleaner, last working in 1999. Her persistent problems include poor hygiene, anger, oppositional behavior and poor impulse control leading to offensive verbal outbursts in public places and physical aggression toward John W. (Exhibits 4, 6, 30, E, E2.) CT Page 12673
John W. and Ronda F. met in early 1997, began dating, and commenced living together in May of that year. By that time Ronda F.'s children, all boys, had been removed from her care through proceedings brought by the Commonwealth of Massachusetts. (Exhibit 6.)
As the result of a prior relationship, John W. is the biological parent of David W. It is uncontroverted that on January 16, 1997, pursuant to a petition filed by DCF, the court terminated John W.'s parental rights to this child. (Dennis, J.)
Sarah was born February 1998. DCF's involvement with the family was prompted by a referral from Massachusetts concerning Ronda F.'s parenting abilities.
In July 1998, DCF enlisted The McCall Foundation (McCalls) to help coordinate a wide series of parenting assistance and counseling programs for John W. and Ronda F. Both respondents completed McCall's "SOS! Help for Parents" program; Ronda F. also completed the "Siblings without Rivalry" classes. Ronda F. briefly participated in the Children of Alcoholics (COA) Parent group, but discontinued her attendance in August 1998, ostensibly due to employment. (Exhibits 5, 15.) She completed an Anger and Stress Management class, but attended only about half of the other McCalls parenting programs in which she was enrolled, despite the free babysitting was available during these sessions. (Exhibit 12.)
John W. also started the COA Parent group, but showed an inconsistent level of interest in and compliance with the program requirements. He stopped attending in mid-August 1998. (Exhibit 16.) He completed a brief basic parenting skills course in November 1998, and attended another parenting course sponsored by Greenwood Counseling Services. (Exhibits F, G.)
As noted above, DCF obtained an OTC for Sarah on September 25, 1998, and John W. became subject to specific steps for reunification. The OTC order was vacated on November 18, 1998, and Sarah was adjudicated neglected on November 30, 1998. (Swienton, J.) Although the child was permitted to remain in her parents' care under protective supervision, the court confirmed the specific steps, which remained in effect. (Exhibit 8.)
I. B. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF NOVEMBER 30, 1998
In January 1999, Ronda F. re-enrolled in the COA Parent group at McCalls. However, she attended only five out of nine meetings scheduled through March 1999, did not complete even rudimentary preparations for CT Page 12674 the sessions, and demonstrated inconsistent attention and willingness to participate. (Exhibits 17, 31.) In view of the angry and disruptive attitude Ronda F. displayed during classes, her lack of cooperation, and failure to accept staff referrals for individual counseling, McCalls terminated its services to her on June 29, 1999. (Exhibits 13, 31.)
In the spring of 1999, John W. and Ronda F. were briefly assisted by an in-home parent aide from the Northwest Center for Family Service Mental Health (Northwest Center). The aide offered guidance on child development issues, communication and stress relief. "Although John was reasonably motivated to work on tasks, Ronda was not. She hardly participated in the weekly visits." (Exhibit 18.) Both parents were found to be so deficient in parenting skills, and Ronda F. was so resistant and uncooperative, that the agency, facing a futile task, terminated its services. (Exhibit 18, 19.) DCF also referred Ronda F. to Catholic Family Services (CFS) for individual therapy, and to STRIVE, a job counseling program. (Testimony of Joanne P.)
In view of unsanitary conditions which persisted at Sarah's home, DCF applied for another OTC on June 22, 1999, and moved to modify the child's protective supervision status. (Testimony of Joanne P.) As noted, on July 12, 1999, the court granted the motion to modify the disposition of protective supervision, and removed Sarah from her parents' care. (Foley, J.) (Exhibit 8.) Thereafter, Sarah has remained in DCF care, specific steps for reunification have remained in effect and the respondents have visited their daughter each week, supervised by McCalls or DCF personnel.
From May through September 1999, John W. participated in four individual therapy sessions at the Northwest Center. His diagnosis at Northwest included Polysubstance Dependence in full sustained remission; Alcohol Dependence in early full remission; Major Depression, recurrent moderate with interepisodic recovery; and Dependent Personality traits. (Exhibit 24.) John W. terminated this counseling due to conflicts with employment which he had obtained, and in September 1999, at DCF's referral, John W.'s mental health care was transferred to CFS.
On October 6, 1999, the court reissued specific steps for the respondent parents to follow in their effort to regain custody of Sarah. (Trombley, J.) (Exhibits 27a, 27b.) The specific steps required John W. to progress in parenting and individual counseling.[6] (Exhibit 27a.) The steps required Ronda F. to participate in parenting, individual and family or couples counseling to make progress in designated treatment goals, including: "Improve ability to function within safe and acceptable social norms, areas of anger management [CFS], personal hygiene, housekeeping, peer relationships, family relationships, successful CT Page 12675 employment, personal relationships." (Exhibit 27b.)[7]
In December 1999, Ronda F. attended one session of scheduled individual therapy at CFS. Despite the recently re-issued specific steps, which expressly required her participation in individual counseling, Ronda F. never returned to CFS for additional treatment. (Exhibit 31.)
In January 2000, in response to DCF's entreaties, McCalls allowed Ronda F. to once again participate in its program of parenting education services from McCalls. (Exhibits 14, DD, 31.) Ronda F. attended another "Siblings without Rivalry" program and attended parenting classes on February 28; March 13; April 25; May 9, 16 and 23; and June 6 and 13, 2000. (Exhibits 14, DD.)
In April 2000, at John W.'s specific request and with DCF's support, this respondent started individual counseling with Cheryl M., M.S. This therapy was frequently interrupted by John W.'s hospitalizations for somatic problems from May through July. (Exhibit 4; Testimony of Cheryl M., Joanne P.) In July 2000, CFS terminated their counseling services for John W., noting that he had attended only nine sessions in ten months on their rolls, and that he had achieved no change in his condition. CFS attributed this lack of improvement to John W.'s poor utilization of treatment, lack of motivation, and failure to follow through with recommendations. (Exhibits 25, 26, 31.)
As noted, after hearing on August 9, 2000 the court determined that efforts to reunify John W. and Ronda F. with Sarah were no longer appropriate. (Trombley, J.)
Ronda F. gave birth to her fifth child, Margaret, on August 2000.[8]
During the summer of 2000, DCF made several unannounced visits to the respondents' home. Despite the extensive parenting instruction and counseling services John W. and Ronda F. had already received, their residence still reflected unsafe and unhygienic conditions which constituted an unsuitable environment for an active two-and-a-half year old, such as Sarah.[9] (Exhibit 31.) When McCalls made a home visit in the early fall 2000, John W. and Ronda F. were still unable to detect the multiple health, safety and general cleanliness issues that persisted at their residence, although these matters had been the subject of careful and specific instruction.[10] McCalls then provided John W. and Ronda F. with basic, structured steps to take in resolving these significant safety and health hazards: some improvement was apparent when McCalls conducted a repeat home visit.[11] (Exhibits 9, 10; Testimony of Janette C.) The respondents did not make themselves available for any home inspections by McCalls personnel. (Testimony of Janette C.) CT Page 12676
John W. was hospitalized for several days in early October 2000, in response to suicidal ideation and a suicide attempt which had occurred notwithstanding his use of antidepressant medication. (Exhibit 4.) He came under the care of Michael C., M.D., a psychiatrist who changed his medication regimen. (Testimony of Dr. C.) As a result of this hospitalization, John W.'s individual counseling with Cheryl M. was again interrupted. (Exhibit 4; Testimony of Joanne P., Cheryl M.)
As noted, DCF filed the pending TPR petitions on October 18, 2000.
I. C. EVENTS FOLLOWING THE OCTOBER 18, 2000 TERMINATION PETITION
In October 2000, Ronda F. underwent a mental health interview at the Northwest Center.[12] (Exhibits 20, 22, 23.) She was diagnosed with Adjustment Disorder with depressed mood, which medication would not avail. Ronda F. attended four individual counseling sessions with Robyn H. at the Northwest Center. However, she failed to attend any further appointments and thus "[p]rogress on goals was minimal. . . ." (Exhibits 20, FF.) Northwest Center closed Ronda F.'s case on January 15, 2001, due to her non-compliance. Although the agency remained available, Ronda F. never requested the resumption of counseling there. (Exhibits 20, 21, 23.) She did, however, join John W. in couples counseling with Cheryl M., which continued into the winter of 2001, then waned. (Testimony of Cheryl M.)
By November 2000, McCalls had provided approximately two and a half years of coordinated parenting education services for John W. and Sarah F. McCall's concluded that both respondents had only minimally complied with the service provider, and determined these parents were unwilling or unable to respond to any form of treatment available.[13] Accordingly, McCalls terminated its work with John W. and for a second time discharged Ronda F. from participation in their programs. (Exhibits 9, 10; Testimony of Janette C.)
At the request of John W. and Ronda F., DCF held a treatment plan hearing on May 26, October 5 and November 2, 2000, to determine whether their weekly visitation with Sarah should be enhanced and unsupervised. On January 16, 2001, the hearing officer concluded that the respondents had not made sufficient progress in developing parenting skills. In light of the August 9, 2000 court order establishing that additional reunification efforts were not appropriate, the hearing officer denied the respondents' request for enhanced visitation. (Exhibit 7.)
After a long period of disruption in their relationship, John W. and Ronda F. separated. When they were evicted from their apartment in early CT Page 12677 2001, John W. went to live with his father, and Ronda F. moved back to live with her parents. (Exhibit 3.)
In response to a request from Ronda F.'s attorney, DCF referred Ronda F. to another parenting service, the Family Ties Program at Waterbury Youth Services System (Family Ties), in early 2001. (Testimony of Joanne P.) However, due to Ronda F.'s lack of response, Ronda F.'s case was closed at that agency on February 22, 2001. (Exhibit 29.)
I. D. THE RESPONDENTS' PSYCHIATRIC AND PSYCHOLOGICAL EVALUATIONS
The evidence reflected that the respondents have participated in a series of mental health evaluations throughout the course of their involvement with DCF and the Juvenile Court.
In December 1998, Stephen Herman, M.D., a skilled and experienced forensic psychiatrist, performed court-ordered psychiatric examinations of John W. and Ronda F. (Exhibits 5, 6a, 31.) Dr. Herman diagnosed John W. with sustained full remission of dependence upon amphetamines, cannabis and cocaine; and early partial, but fragile, remission of alcohol abuse and alcohol dependence. John W. remained at risk for recurrence of the mood disorders that had troubled him in the past. (Exhibit 5.) Dr. Herman found Ronda F. to be of low-normal intellectual ability, with minimal insight into her own psychological issues. Ronda F. actively denied and minimized the serious problems with which she was involved regarding Sarah and her other children. (Exhibits 5, 6a, 31.)
In April 2000, Ronda F. was evaluated at a local hospital at DCF's request. Although her personality disorder and poor judgment were again identified, these conditions were not amenable to immediate psychiatric treatment, and the hospital recommended instead that Ronda F. undergo counseling to develop both parenting and basic daily living skills. (Exhibits 4, 28, EE.)
On October 30, 2000, John W. and Ronda F. underwent court-ordered evaluations by Robert Neems, Ph.D., a skilled and experienced clinical psychologist. (Exhibit 4.) Dr. Neems confirmed the Northwest Center's conclusion that John W. was affected by Major Depression, Recurrent, Moderate; Borderline Personality Disorder; and Alcohol Dependence. (Exhibit 4.) Ronda F. was diagnosed with Dysthymic disorder, Mixed Personality Disorder with impulsivity, oppositional behavior and anger control problems; and borderline intellectual functioning. (Exhibit 4.) Psychometric testing showed that Ronda F. also suffered from anxiety, poor judgment, a somewhat limited ability to understand and to use verbal information, and immaturity in managing her own daily affairs. CT Page 12678
On January 3, 2001, Dr. Neems again performed court-ordered psychological examinations of John W. and Ronda F., and also conducted an interactional evaluation of the respondents with Sarah. The results of this assessment are discussed in Parts II. B. 1. a. and b.
I.E. SARAH
As noted, Sarah was born February 1998. She is three-and-a-half years old, and has lived in foster care most of her life, continuously since she was almost a year and a half old. She is developmentally appropriate and well adjusted. Sarah is comfortable with Ronda F. during visits and shows affection for John W., but is not significantly attached to either of them. On January 5, 2001, Sarah was moved to a new foster home, where her needs are well met, and where she happily and safely resides. (Exhibit 3; Testimony of Joanne P.)
 II. ADJUDICATION
In the adjudicatory phase of this hearing,[14] as the grounds against each parent are based on failure to rehabilitate, the court has considered the evidence and testimony related to circumstances and events following the adjudication of neglect, through the date the TPR petitions were filed, and through the close of evidence.[15] The critical issues in this case concern whether or not John W. and Ronda F. have achieved a sufficient degree of personal rehabilitation regarding their mental health and behavioral issues, the key elements upon which all parties focused during the trial. Upon review, the court has determined that a statutory ground for termination has been proved to exist as to each respondent.
II. A. LOCATION AND REUNIFICATION EFFORTS
As contemplated by General Statutes § 17a-112(j)(1),[16] the court finds by clear and convincing evidence that reasonable efforts[17]
were made to reunify John W. and Ronda F. with Sarah, under the totality of the circumstances existing in this matter, through the repeated provision of case management[18] and visitation-related services, parenting education, and mental health support,[19] all addressed at trial. The court is mindful that on August 9, 2000, it was found after hearing that reasonable efforts to reunify the respondents with Sarah were not appropriate. (Trombley, J.) Consistent with this order, and with the evidence presented at the trial of this matter, this court confirms that John W. and Ronda F. are unable or unwilling to benefit from further reunification efforts.
II. A. 1. REASONABLENESS OF EFFORTS AND SERVICES PROVIDED
CT Page 12679
John W. and Ronda F. forcefully assert that DCF failed to make reasonable reunification efforts in this matter, as they received rehabilitation services which were inappropriate for their cognitive limitations and/or mental health issues.[20] Without identifying specific alternative rehabilitation efforts, the respondents argue that because the proffered services were not sufficiently tailored to their needs, they could not reasonably be expected to have achieved rehabilitation. The court respectfully disagrees.
Despite the vigor of the respondents' allegations, the evidence clearly and convincingly reflects that John W. and Ronda F. received services that were fully suited to them and their circumstances. The therapists and parenting providers communicated with John W. and Ronda F. on a basic level, emphasizing the oral transmission of content without overly relying upon written material, and relaying significant information without resorting to sophisticated terminology or complex methodology.[21] Janette C., the parenting coordinator with whom the respondents worked at McCalls, is well educated, experienced, and skilled in dealing with special needs students: she was patient with, adept at and committed to instructing and counseling John W. and Ronda F. in parenting and basic life skills matters. Robyn H., Ronda F.'s psychotherapist at Northwest, is an experienced licensed clinical social worker: she found that Ronda F. was well able to communicate, without special adaptations, during the limited time this respondent attended counseling sessions. John W. chose to receive counseling from Cheryl M., supporting the inference that he was able to communicate well with this therapist.
The evidence clearly and convincingly reflects that John W.'s average intellectual functioning did not present a measurable obstacle insofar as parenting or psychotherapeutic treatment was concerned, or interfere with his ability to benefit from services.[22] (Exhibits 2, 3, 4; Testimony of Dr. Neems.) The court notes that at McCalls, both group instruction and "ongoing weekly parenting classes individually" were provided to John W., representing a valid effort to respond to his emotional needs by extending a high level of services, above and beyond the agency's usual protocol. (Exhibit 31; Testimony of Janette C.) Even if, as he insists, John W. is found to be a "person with a disability" in the context of TPR jurisprudence,[23] the evidence in this case clearly and convincingly establishes that DCF made prolonged, reasonable and responsible efforts to address his noted parenting deficits, while accommodating any extant physical restrictions, personality limitations, and mental health issues.[24] (Exhibits 2, 3; Testimony of Dr. Neems.)
The clear and convincing evidence similarly reflects that Ronda F.'s CT Page 12680 intellectual limitations were recognized in a timely fashion and responded to by the parenting and mental health professionals with whom she chose to remain involved. As noted above, parenting education and individual counseling were delivered to Ronda F. in a careful, deliberate, sequential manner which she was capable of absorbing.[25]
Both group and individual learning settings were utilized; past work was reviewed; basic level homework assignments were given; and multi-modal educational techniques were employed, including the use of videotaped instructional materials. Step-by-step instruction was given, and she was encouraged to work through examples of how she would apply what she had learned. Ronda F. was also assisted in learning the skills necessary to meet the activities of daily living, which she lacked throughout. (Exhibit 31.) The level of detailed explanation that McCalls, Robyn H. and Cheryl M. provided to Ronda F. was fully appropriate for this respondent's cognitive difficulties or comprehension problems. (Exhibit 4; Testimony of Dr. Neems, Robyn H., Cheryl M.)
Should Ronda F. have cooperated with the rehabilitative process, she would have been in a position to benefit from the exemplary special services tendered by McCalls and by the individual counselors. However, Ronda F. did not cooperate, and instead remained extremely resistant to receiving services. She became involved with another man while living with John W., impulsively attended to her personal priorities instead of the rehabilitation process, generally lacked motivation and consistently rejected the notion that help is needed for her to learn to parent Sarah or to cope with her own problems. Given Ronda F.'s hostile attitude toward services during the pendency of this matter, the court concludes that it is extremely unlikely that Ronda F. would benefit any more from alternative services than she has from those tendered in this case. (Testimony of Dr. Neems.)
The evidence overwhelmingly shows that DCF properly assisted in the rehabilitation process by extending services which were appropriate for the respondents' circumstances and particular needs.[26] John W. and Ronda F. may indeed have required more time than some, and more careful attention than others, in the process of responding to parenting counseling and psychotherapy services. The clear and convincing evidence in this matter supports the conclusion that such specialized services were indeed provided to them, and they were given an extended period of time within which to achieve rehabilitation. In this case, it was not the design of the services rendered, but Ronda F.'s own mercurial personality and lack of cooperation, and John W.'s panoply of unresoluable emotional and physical issues, that kept the respondents from achieving successful rehabilitation.[27]
II. A. 2. REASONABLENESS OF DCF's INVOLVEMENT WITH SERVICE PROVIDERS
CT Page 12681
John W. and Ronda F. also assert that DCF's investigation of their mental health conditions and direct contact with their therapists adversely impacted the effectiveness of any treatment they received, and that thereby the agency failed to extend the reasonable reunification efforts required by § 17a-112(j)(1). The petitioner responds that investigation of the respondents' mental health status is fundamentally related to its obligation to administer rehabilitative services and protect the best interests of the child in this case. The court finds this issue in favor of the petitioner.
The evidence clearly and convincingly establishes that any contact DCF had with Sarah's parents' mental health providers was fairly and reasonably conducted within the parameters established by both state and federal law.[28] The respondents have provided no Connecticut authority to support their contrary position. However, John W. relies on a 1979 New Hampshire decision for the proposition that DCF's involvement with their mental health providers fatally compromises the "`successful therapeutic treatment of parents [which] is crucial to the preservation of family unity.'"[29] While a parent's rehabilitation may, indeed, be fundamental to successful reunification, modern courts hold parents responsible for remediation of the problems which had caused intervention by child service agencies in the first place. Modern and effective courts do not, as John W. suggests, limit their focus to issues of family preservation: rather, courts currently recognize that child-centered issues of safety are worthy of great emphasis.[30] On balance, the facts of this case support the conclusion that DCF's reasonable collection of data concerning the progress made in the respondents' therapeutic process far outweighs any potential harm to the parents, while enabling the court to serve the best interests of the child for whom a TPR petition has been filed. General Sections § 17a-112(p); see also In re Romance M., 30 Conn. App. 839, 852, 622 A.2d 1047 (1993), appeal dismissed, 229 Conn. 345, 641 A.2d 378 (1994).[31] In view of these salutary policies, and in the absence of contrary Connecticut law, the court can ascribe but little weight to this aspect of the respondents' argument.
Furthermore, even if John W. is correct in emphasizing family preservation over the safety and security of the child at issue and in claiming that DCF's investigation can irreparably harm the rehabilitative process in some cases, the evidence in this matter clearly and convincingly establishes that DCF's contact with the instant respondents' mental health providers did not "wreak havoc" on efforts to treat their serious emotional issues, and that the agency never attempted to "run roughshod over the treatment needs of the parent[s]" as John W. has claimed. (Father's Brief) Rather, the evidence in this case reflects that CT Page 12682 DCF's properly expressed interest in the respondents' mental health conditions caused no measurable effect upon John W., Ronda F. or their therapeutic process. John W.'s own psychiatrist was unable to quantify, or even to identify, any negative effect caused to this respondent by DCF's involvement in the case.[32] (Testimony of Dr. C.) John W.'s therapist, Cheryl M., acknowledged that, at times, her communications with DCF diminished John W.'s ability to trust her. However, as both Cheryl M. and Dr. Neems noted, the far greater degree of the respondent father's failure to respond to valid treatment is attributable not to DCF's role in this case, but to John W.'s depression and his intrinsic borderline personality disorder.
As to Ronda F., the evidence clearly and convincingly establishes that it was her own failure to adequately cooperate with the personal counseling or parenting education processes, and not DCF's appropriate contact with health care providers, which caused her failure to benefit from reasonable habilitation efforts. Ronda F.'s hostility to and rejection of services diminished all attempts to help her come to terms with the severity of her problems, so she remained unwilling or unable to achieve a positive response these efforts, despite their multi-disciplinary approach. (Testimony of Cheryl M., Robyn H., Dr. Neems; Janette C.)
In this matter, it is abundantly clear that the respondents' counselors and therapists were well aware of their responsibility to protect and enhance their confidential relationship with their patients, and they did so while cooperating with the investigatory process.[33] Moreover, the facts illustrate that the therapeutic counseling in this case was a critical elemental of the court-ordered specific steps for parental rehabilitation. DCF's attention to the degree of progress made in rehabilitation was no more intrusive than it had to be to protect the best interests of the child at issue in this case.[34] §§17a-112(1)(3)(B), (p). As DCF's investigation in this matter was conducted in a responsible manner, befitting the nature and circumstances of the respondent's issues and Sarah's needs for safety and security, John W. and Ronda F. cannot here prevail.
II. B. STATUTORY GROUNDS FOR TERMINATION
II. B. 1. FAILURE TO REHABILITATE — § 17a-112(j)(3)(B)— JOHN W. AND RONDA F.
The petitioner asserts that because John W. and Ronda F. failed to achieve rehabilitation within the meaning of General Statutes §17a-112(j)(3)(B)(i), their parental rights to Sarah should be terminated.[35] It is uncontroverted that Sarah was adjudicated a CT Page 12683 neglected child on November 30, 1998. It is further uncontroverted that, over the years, the court has issued a series of specific steps to assist John W. and Ronda F. with their rehabilitation. During the approximately two and a half years that have followed Sarah's adjudication as a neglected child, John W. made a sincere effort to comply with the rehabilitative providers and the specific steps, and Ronda F. has partially participated in this process. Notwithstanding the long period of time provided for rehabilitation to occur, the clear and convincing evidence establishes that as of October 18, 2000, the date the TPR petitions were filed, and even as of the close of evidence in this trial on June 7, 2001, neither parent had either accomplished such personal rehabilitation as is contemplated by § 17a-112(j)(3)(B), or had achieved such degree of rehabilitation as would encourage the belief that within a reasonable time, considering Sarah's age and needs, such parent could assume a responsible position in her life.[36] Accordingly, as to both John W. and Ronda F., the court finds these issues in favor of the petitioner.
II. B. 1. a. JOHN W.
Despite vigilant efforts by service providers, the evidence clearly and convincingly shows that John W. has made lamentably little progress either in his own ability to parent, or in his ability to address the many personal, physical and emotional challenges he faces in life. As noted in Part I., John W. made noted efforts to cooperate with the extensive service providers who worked to develop his capacity to parent Sarah. He attended numerous programs at McCalls, where he received caring, thoughtful and exhaustive attention to his particular needs. He cooperated with the in-home parent aide provided by the Northwest Center but only briefly accepted individual counseling through that agency. He attended counseling at CFS, but was discharged for lack of cooperation and failure to participate in recommended anger management therapy. John W. participated in a long series of private and couples counseling sessions with Cheryl M., and has received psychiatric care and treatment, as well. He has undergone evaluations by Dr. Herman and Dr. Neems.
Nonetheless, despite all of these efforts, by late 2000 John W. had achieved only a limited ability to safely and appropriately parent his daughter. On a personal level, his functioning was marred by his unremitting depression, which led to a suicide attempt and hospitalization late in the rehabilitative period. As noted in Part I. B., his parenting skills remained so minimal in nature, notwithstanding protracted instruction, that he could barely identify unsafe or unsanitary conditions a young child would be likely to encounter in his household. (Testimony of Janette C.) Overall, the evidence reflects that even John CT Page 12684 W.'s lengthy course of attention from mental health therapists, accompanied by the specialized parenting education classes and visitation supervised by McCalls, yielded but a small improvement in his parenting abilities, falling short of gaining the ability to provide parenting care for Sarah.[37] In re Sarah Ann K., supra, 57 Conn. App. 448.
This conclusion is specifically supported by the evidence related to John W.'s psychological and psychiatric assessments.[38] While Dr. Neems found John W. to have average intelligence, his ability to benefit from services or to function as a parent was impeded by his depression, borderline personality disorder, substance dependence, immaturity, insecurity, impulsivity and anger, along with his minimization of these problems. (Exhibits 2, 4, 4a.) John W.'s dependence upon Ronda F., with whom he maintained a turbulent relationship, has an exacerbating effect on his underlying depression.[39] (Exhibit 4.) Other aspects of John W.'s personality have also resisted the extensive parenting and counseling services provided to him. He continues to minimize the problems he faced in dealing with his social, physical, financial and personal circumstances. His poor judgment and habitual denial are manifest in his report that he was discharged from McCalls after completion of all their parenting programs, when, in fact, he was terminated for lack of progress in rehabilitation. John W. remains significantly vulnerable to the many stressors which persist in his life, which would be exacerbated by the addition of the obligation to safely parent an energetic pre-school child such as Sarah. (Testimony of Dr. C.)
The fragile sobriety noted by Dr. Herman in 1998 has not become more secure as time has passed, as evidenced by John's return to alcohol use at about the time he attempted to take his own life.[40] John W.'s depression and anxiety, detected by Dr. Herman years ago, continue to afflict him despite medication with Zoloft, Depacote and Buspar. (Exhibits 5, 6a; Testimony of Dr. C., Dr. Neems.) As Dr. Neems cogently concluded: "[John W.] continues to have serious problems with dependency, depression, emotional instability, anger, tolerance of mistreatment by [Ronda F.], impulsivity, and intermittent substance abuse . . . In my opinion, [John W.] is not able to handle the responsibilities of independently taking care of a child." (Exhibit 3.)
The same personal concerns recur for John W. notwithstanding his involvement with well-designed mental health services: ingestion of an overdose of medication during a period of depression; repeated domestic violence; inability to maintain regular employment; failure to accept responsibility for the circumstances in which he finds himself. His judgment remains inappropriate: he misled his parenting counselor by withholding information that would have assisted in the therapeutic process, such as recent police intervention at his home, and CT Page 12685 hospitalization for an apparent suicide attempt; he allowed his psychiatrist to erroneously assume that concurrent psychotherapy was being administered by another provider, and failed to advise him that Cheryl M. had recommended enhanced treatment for his intractable conditions. (Exhibit 11; Testimony of Cheryl M., Dr. C., Janette C.)
Similarly, the same parenting concerns recur for John W. notwithstanding long-term specific, related rehabilitative services: inability to keep Sarah safe; lack of appropriate disciplinary and limit-setting techniques; lack of resources with which to engage Sarah's attention or keep her active during visitations. Although initially attentive, over time he became uncooperative with the parenting education process, reducing his attendance at classes and attention to his homework, indicating a lack of motivation and interest in this aspect of his rehabilitation through his failure to complete tasks, and failure to integrate what he had been taught into his own lifestyle or into the process of interacting with Sarah.[41] (Exhibit 11; Testimony of Cheryl M., Janette C.) As a result, despite years of specific parenting education and safety instruction, John W. was still unable to demonstrate even rudimentary parenting skills. (Testimony of Janette C.)
John W. would have the court focus upon the fact that he has attended numerous parenting courses, and has cooperated, in large part, with the individual counseling provided by Cheryl M. However, the issue for the court is not merely whether John W. attended sessions, but instead whether he has sufficiently benefitted so as to assume a responsible position in the life of his child within a reasonable time. In re AshleyS., 61 Conn. App. 658, 666, ___ A.2d ___ cert. denied, 255 Conn. 950,___ A.2d ___ (2001). Applying the test of In re Ashley S. to John W.'s case, while it is apparent that the respondent father has attended some counseling sessions and has completed some parenting programs, the evidence clearly and convincingly establishes that his emotional and physical problems have not adequately responded to the plethora of services provided, and that despite all this time and effort, he still lacks the capacity to care for his young daughter Sarah or even to focus on his child instead of upon himself. Furthermore, the circumstances of this case do not permit the inference that John W. will be able to assume a useful role in Sarah's life within a reasonable time. Even if John W. has achieved a degree of personal rehabilitation with regard to managing his own needs, the undeniable fact is that his judgment remains poor, and his overall potential as a parent is profoundly affected by his serious unresolved somatic and mental health concerns. As Dr. Neems has stated: "[John W.] has failed to benefit from extensive services over a period of years . . . He is internally focused and is not very observant of his environment or of other people. He does not recognize and respond to problems. He seems to be overwhelmed with the fear of abandonment and is CT Page 12686 unable to sufficiently pay attention to others to be able to take care of a child. . . . [John W.'s] personal problems are long standing and have shown minimal change during the past three years of intensive services. I do not think that they are likely to change sufficiently for him to be able to parent a child in the near future." (Exhibit 4; see also Testimony of Dr. Neems.) Both Cheryl C. and John W.'s psychiatrist, Dr. C., concur in the finding that John W.'s personal and parenting deficits are likely refractory to any available treatment. (Testimony of Cheryl M., Dr. C.)
The clear and convincing evidence in this matter thus supports the conclusion that John W. was no more able to assume a responsible position in Sarah's life at the time of the filing of the petition, or at the conclusion of the evidence, than he was at the time of her neglect adjudication. He will not, in the reasonably near future, be able to parent Sarah in a manner which provides the consistent, stable, predictable and secure environment in which she is entitled to spend her childhood years. (Exhibit 3; Testimony of Dr. Neems.) In re Eden F., supra, 250 Conn. 706; In re Stanley D., supra, 61 Conn. App. 230. Accordingly, the petitioner has met her burden of proving John W.'s failure to achieve rehabilitation by clear and convincing evidence, as contemplated by § 17a-112(j)(3)(B).
II. B. 1. b. RONDA F.
Ronda F.'s presenting issues involved lack of basic parenting skills, and inadequate control of her anger and physical aggression. For the following reasons, the clear and convincing evidence in this matter reveals that despite the wide array of assistance offered to her, Ronda F. has failed to gain ground with regard to either aspect of her rehabilitation, sufficient to enable her to serve as a valid parental resource for Sarah.
Although she attended some parenting classes over the years, as described in Part I., the evidence clearly and convincingly establishes that Ronda F. has little commitment to the rehabilitation process and, concomitantly, she has achieved little rehabilitative success. This respondent's history of cooperation with the rehabilitative process is replete with "second chances" and failures. As noted, she briefly participated in a variety of service programs at McCalls during the summer of 1998, but was dropped from the program rolls for non-attendance and non-compliance. Ronda F. recommenced parenting education classes at McCalls in January 1999, while she received assistance from Northwest's parenting aide and had the additional benefit of on-site child care during sessions: still, Ronda F. failed to adequately participate in McCalls' programs, and displayed a scornful, angry and disruptive attitude when she CT Page 12687 did attend classes. Accordingly, in early summer 1999, McCalls again discontinued services to Ronda F.
As noted in Part I. B., DCF persisted in its efforts to assist Ronda F. in her rehabilitation, even cajoling McCalls into restoring this respondent's access to their parenting education services.[42]
However, although Ronda F. was permitted to enroll at McCalls a third time in January 2000, she again demonstrated minimal compliance with proffered programs, and continued to maintain a living environment that was inappropriate for a young child's needs.[43] From the end of August through early November 2000, Ronda F. paid little attention to the process of developing her parenting skills, and she made no constructive improvement in her ability to care for Sarah. (Testimony of Janette C.) Accordingly, in November 2000, McCalls again terminated its services to Ronda F. Unfortunately, despite the additional parenting services obtained through Family Ties, Ronda F. failed even to take advantage of this opportunity, and was discharged from this program, as well, for non-compliance and lack of attendance.
Regrettably, Ronda F. showed as little commitment to her personal counseling process as she showed to her parenting education and, similarly, she achieved only a minimal degree of rehabilitation. As described in Part I., multiple efforts have been made to address Ronda F.'s poor judgment, temper, physical aggression, oppositionality, impulsivity, and lack of insight into her problems, all issues which were discerned by Dr. Herman during his 1998 examination. However, Ronda F. chose not to complete the individual counseling offered to her, failing to cooperate with CFS, with Cheryl M., or with Robyn H. at Northwest.[44]
Ronda F. did not complete anger management classes, which were clearly called for in view of her significant issues with temper and outbursts, and there are no objective indications that Ronda F. ever gained control over her volatile personality. In sum, as indicated in Part I. C., by the time of trial, Ronda had paid little or no attention to achieving the treatment goals set forth in the specific steps. She had not improved the status of her mental health issues related to adjustment, oppositionality, or the ability to recognize why others have found her unable to provide adequate care for her children. (Testimony of Robyn H.)
The evidence reveals that Ronda F. is affected by numerous factors which might prompt her failure to benefit from rehabilitative services: fortunately, the service providers identified these factors, and worked to optimize the effect of Ronda F.'s treatment experiences. (Testimony of Dr. Neems, Janette C.) For instance, the parenting education and counseling process was specifically directed to Ronda F.'s noted level of comprehension and ability to perform, meeting her limited intellectual CT Page 12688 capacity and nullifying its potential impediment to her success, as more fully discussed in Parts II. A. 1. and 2., above. When Ronda F.'s generally oppositional personality interfered with her acquisition of necessary parenting skills, the providers used patience and multi-modal teaching methods to bypass the respondent's tendency to "brush off" any advice that was rendered.[45] Certain aspects of Ronda F.'s personality could not be surmounted, however, even by dedicated, experienced parenting educators and counselors: Ronda F.'s poor judgment and impulsivity, which she allowed to remain untreated and unremediated by her failure to attend adequate counseling sessions, led her to rebuff the efforts extended by others who wanted to help her. Ronda F.'s continuing, severe problems with anger control, which led her to explode in class settings, and to antagonize the service providers, vitiated well-founded efforts to achieve rehabilitation for this respondent. As Dr. Neems pointed out, despite all the services provided to her, Ronda F. consistently chose to deny or to minimize her problems with anger and personal issues, and instead "copes by dismissing or denying things about herself that she wishes were not true." (Exhibit 4.)
The personality characteristics described above may help explain, but do not excuse, Ronda F.'s anger at those who have tried to help her, her tendency to blame others for the problems she has encountered, her persistent hostility to and rejection of rehabilitation services, and her ultimate failure to achieve rehabilitation. It is significant that when Dr. Neems performed his interactional evaluation with Sarah on January 3, 2001, Ronda F. appeared to be more depressed than she had been in the past, and yet still could not recognize that she was in great need of therapeutic counseling. Despite years of parenting education programs, Ronda F. has failed to develop a meaningful degree of proficiency in setting limits for Sarah, and she has a poor understanding of the child's capabilities and stage of development.[46] She continues to minimize her problems of anger and physical aggression with John W., and her lack of judgment is evidenced in the fact that she withheld from her counselors relevant information concerning police response to a domestic dispute at her home, or the eviction process in which she and John W. were involved. (Exhibit 10.)
In sum, the evidence clearly and convincingly reflects that despite significant and appropriate services, Ronda F. still cannot put into practice any skills or techniques she should have acquired from the parenting classes and counseling she has attended.[47] (Exhibits 4, 10, 13, 14; Testimony of Dr. Neems, Janette C.) Her unwillingness to accept recommendations from others, and her failure to cooperate with the parenting education and counseling process, even to the extent of her abilities, have left her without the capacity to serve as a safe and responsible parental resource for Sarah. Based on the totality of the CT Page 12689 clear and convincing evidence adduced in this matter, it is thus apparent that Ronda F. has failed to achieve a degree of rehabilitation which would reasonably encourage a belief that she could assume a responsible position in Sarah's life at some date in the relatively near future. In reEden F., supra, 250 Conn. 706; In re Stanley D., supra, 61 Conn. App. 230. Accordingly, the petitioner has met her burden of proving Ronda F.'s failure to achieve rehabilitation by clear and convincing evidence.
II. B. 2. FAILURE TO REHABILITATE WITH PREVIOUS TERMINATION OF PARENTALRIGHTS — § 17a-112(j)(3)(E) — JOHN W.
As to John W., the petitioner also claims that the statutory grounds for termination established by General Statutes §17a-112(c)(3)(E)[48] exist in this case, supporting termination of his parental rights to Sarah. As noted above, John W.'s parental rights to his biological son David W. were terminated by court order on January 16, 1997, pursuant to a petition filed by DCF. Adopting the discussion concerning John W.'s failure to rehabilitate as set forth in Parts II. A. 1., 2. and II. B. 1. a., the court finds, by clear and convincing evidence, that the petitioner has met her burden of proving the statutory grounds established by § 17a-112(j)(3)(B).
 III. DISPOSITION
As to the dispositional phase of this hearing,[49] the court has considered the evidence and testimony related to circumstances and events up to the conclusion of trial.
III. A. SEVEN STATUTORY FINDINGS
In deciding the issues related to termination, the court has considered the evidence relevant to each of the following seven findings, which are based on the clear and convincing evidence. In re Jonathan G.,63 Conn. App. 516, 527-29, ___ A.2d ___ (2001).
III. A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — §17a-112(k)(1)
Appropriate and timely services have been made available by DCF to remediate the respondents' parenting deficits, and to facilitate the reunification of the respondents with their child, as thoroughly discussed in Parts I. and II. The home of Sarah's maternal grandparents has been offered as a resource for Sarah. However, that family's history reflects that they are unable to maintain a safe and sanitary home, so that such placement is inadequate to the child's needs. (Testimony of Joanne P.) CT Page 12690
III. A. 2. EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW —§ 17a-112(k)(2)
As discussed in Parts I. and II., DCF made reasonable efforts to reunite John W. and Ronda F. with their child pursuant to applicable federal law, given the situation and circumstances here existing, and recognizing the respondents' protracted problems in achieving rehabilitation.[50] The institution of termination proceedings is consistent with the federal law which seeks to limit foster care drift and to secure permanent placement for children who are in foster care.
III. A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112(k)(3)
Although both the November 1998 and October 1999 specific steps required John W. to execute releases permitting DCF to access information from his health care providers, he refused to fully cooperate with this process after December 2000. John W. further failed to adequately participate in domestic violence issues. (Exhibit 27a; Testimony of Joanne P.) As discussed above, despite the specific steps, Ronda F. failed to attend sufficient counseling sessions to improve her functioning as a parent or to minimize her anger management issues. (Exhibit 27b.)
III. A. 4. FEELINGS AND EMOTIONAL TIES OF THE CHILD — §17a-112(k)(4)
Sarah has developed strong emotional ties with her foster parents, including those with whom she has lived since early 2001. (Testimony of Joanne P.) She calls her foster parents "mommy" and "daddy," and refers to her biological parents as "John" and "Rondy." Sarah is aware that she has a sister, Margaret, but has a closer relationship with her new foster siblings. (Testimony of Joanne P.) She recognizes Ronda F. as a mothering figure and has a positive relationship with her, but is more attached to the foster mother with whom she lives. Sarah also has a positive relationship with John W., as contrasted to a negative relationship,[51]
but is also attached to her foster father. (Exhibit 3; Testimony of Joanne P.)
III. A. 5. AGE OF THE CHILD — § 17a-112(k)(5)
Sarah was born February 1998, and is almost three and a half years old.
III. A. 6. EFFORTS MADE TO ADJUST PARENTS' CIRCUMSTANCES — §17a-112(k)(6)
Both parents have failed to make realistic and sustained efforts to CT Page 12691 conform their conduct to acceptable parental standards. While Ronda F. has participated to a small degree in the various programs and counseling that have been offered for her personal rehabilitation, her persistent lack of cooperation and denial of the need for services predominates. While John W. attended parenting classes and counseling, his re-emergent use of alcohol and his suicide attempt in the fall of 2000 indicate that despite his earlier attempts, he too continues to focus on his own needs, without achieving acceptable parental standards.
III. A. 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAININGA RELATIONSHIP WITH THE CHILD — § 17a-112(k)(7)
Although the limitations inherent in the foster care system have been in effect in this case to protect Sarah, neither parent has been prevented from maintaining a meaningful relationship with Sarah by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.[52] Economic factors did not prevent regular, continuing contact between Sarah and her parents, after the final decision to remove her from their home in 1999, and, as Dr. Neems has indicated, only supervised visitation was psychologically appropriate for the respondents and their young daughter.[53] (Exhibit 3.)
III. B. BEST INTERESTS OF THE CHILD — § 17a-112(j)(2)
The court is next called upon to determine whether termination of the parental rights of John W. and Ronda F. would be in Sarah's best interests.[54] Applying the appropriate legal standards[55] to the facts found above, the court finds this issue in favor of termination.
It is clear that both John W. and Ronda F. love their young daughter. Nonetheless, this emotion, however powerful, is unable to overcome the clear and convincing evidence that both respondents are unable or unwilling to provide a safe, predictable and nurturing environment for Sarah,[56] or to serve as her primary caretaker. Despite their professed love for their daughter, John W. and Ronda F. have been unable to conduct themselves in a way which actualizes that love into a manner of life conducive to raising Sarah. The parent educator, the evaluating psychologist and psychiatrist, and the mental health counselors credibly opined that neither John W. nor Ronda F. could achieve rehabilitation within any reasonable period of time, given Sarah's age and needs. The court is constrained to agree, having found that neither parent has initiated the significant personal changes necessary to be able to care for this child. "[A] parent's love and biological connection . . . is simply not enough" when the circumstances indicate, as here, that the respondents cannot serve as competent parents because they have not CT Page 12692 become rehabilitated, and cannot provide the child with the nurturing, safe and predictable environment she so richly deserves. In re AshleyS., supra, 61 Conn. App. 667.
In reaching this conclusion, the court has remained fully cognizant of the evidence which reflects that the respondents both battle mental health issues, among their other challenges. Notwithstanding such hardships, "`[t]ermination has been consistently recognized as being in the best interest of the child when the parent has a mental deficiency or illness which renders [him or] her unable to provide the child with necessary care.' In re Nicolina T., 9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987)." In re Antony B., supra, 54 Conn. App. 473. See also In re Jessica S., 51 Conn. App. 667,673, 723 A.2d 356 cert. denied, 251 Conn. 901, 738 A.2d 1090 (1999). The case at bar presents just such a case, in which the parental rights of John W. and Ronda F. must give way, in order to allow Sarah to be free to pursue a safe, secure and happy life of her own.
Sarah, who is just over three years old, has been in foster care for half of her life. "[L]ong-term stability is critical to a child's future health and development." In re Eden F., supra, 250 Conn. 709. In addition, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1992); see also In re Juvenile Appeal (84-CD), 189 Conn. 276,292, 455 A.2d 1313 (1983). The court notes that Sarah's current foster parents wish to adopt her, an event which would provide her with permanency, security, and the best opportunity to timely acquire structure, nurturance and stability in her life. (Testimony of Dr. Neems.) The court also recognizes that termination of parental rights is not a benign event for the respondents or the child involved in the proceedings. However, in this case, any other option would unreasonably prolong the uncertainty of the outcome in this matter, and cause far more harm to Sarah than is warranted in this case. (Testimony of Dr. Neems.)
Sarah has a strong, present need for permanency. She needs to belong to a family with whom she will be able to bond and grow close, and she needs this to be achieved now, without waiting any longer. Sarah's GAL has described her present, pre-adoptive living situation as one in which she is safe, secure, and very, very happy. The court concurs with the GAL, and concludes that it would be in Sarah's best interests to terminate the parental rights of John W. and Ronda F., so that this child will be free for adoption by loving parents who are, as well, able to care for her in a responsible manner. CT Page 12693
 IV. ORDER OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights and having determined, upon all of the facts and circumstances presented, that it is in the child's best interests to terminate the parental rights of John W. and Ronda F., accordingly ORDERS:
That the parental rights of John W. and Ronda F. are hereby terminated as to Sarah W.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Sarah W., for the purpose of securing an adoptive family or other permanent placement for this child.
That within thirty days of this judgment a written report addressing a permanency plan for the child shall be submitted by the Commissioner, and that such further reports shall be filed by DCF as are required by state and federal law.
BY THE COURT,
N. Rubinow, J.